**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**BETHLEHEM STEEL CORPORATION
et al., Defendants-Appellees.**

**No. 266, Docket 35183.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 7, 1970.

Decided June 21, 1971.

1. See N. L. R. B. v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 430 F.2d 966.

David L. Rose, Atty., Dept. of Justice (Jerris Leonard, Asst. Atty. Gen., H. Kenneth Schroeder, Jr., U. S. Atty. W. D. N. Y., Robert T. Moore, Atty., Dept. of Justice, on the brief), for plaintiff-appellant.

Ralph L. McAfee, New York City (Cravath, Swaine & Moore, New York City, on the brief), for defendant-appellee Bethlehem Steel Corp.

Michael Gottesman, Washington, D. C. (Bredhoff, Gottesman & Cohen, Washington, D. C., Bernard Kleiman, Chicago, Ill., Thomas Krug, Tiernan, Krug & Godinho, Buffalo, N. Y., on the brief), for defendants-appellees Unions.

Before LUMBARD and FEINBERG, Circuit Judges, and CLARIE, District Judge.*

FEINBERG, Circuit Judge:

In December 1967, the Attorney General of the United States brought an action against the Bethlehem Steel Corporation in the United States District Court for the Western District of New York. Suit was filed pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., a historic legislative attempt to deal with the national problem of discrimination in employment. The complaint alleged that Bethlehem discriminated against blacks in hiring, job assignment, apprenticeship and selection of supervisory personnel at its plant in Lackawanna, New York. An amendment to the complaint in May 1968 added the United Steelworkers of America and five local unions as defendants and alleged that portions of the collective bargaining agreement between Bethlehem and the unions perpetuated discrimination.

Before trial, defendants admitted that many of the charges against them were true, but they refused to stipulate that portions of the labor contract violated the Act. A trial on that one issue was held before Chief Judge John O. Henderson. The judge held in a comprehensive opinion, 312 F.Supp. 977, that the contract provisions as to transfer rights and seniority did perpetuate the effects of prior discrimination. As a result, the judge granted priority transfer rights to those who had been discriminated against, but denied a portion of the re-

---

* Of the District of Connecticut, sitting by designation.

lief sought by the Government that would have made the exercise of such rights more attractive. From that order only the Government appeals. For reasons set forth below, we modify the order. The principal effect of our opinion is to grant to those who have been treated illegally in the past the right to transfer without loss of pay or seniority.

## I.

The Lackawanna plant, one of the largest of its type in the country, employs about 18,000 workers, of whom approximately 2,600 are black. Operations at the plant cover all phases of steel production from the receipt of raw materials to the final product. Hourly-paid employees, who are represented by the defendant unions, work in 74 of the plant's 82 departments. The 74 departments are organized into 81 seniority units, most of which coincide with the structure of departments.[1] However, in the Coke Ovens Department, of particular interest here, there are four seniority units.

The facts as to discrimination were admitted by defendants in two extensive stipulations. These showed that both before and after the passage of the Civil Rights Act of 1964 blacks were treated unfairly at the Lackawanna plant in hiring, job assignment, apprenticeship and selection of supervisors. The following patterns of discrimination continued up to the time when the Government began its inquiry into Bethlehem's practices. In hiring, jobs were made available to whites rather than to blacks in a number of ways. There were no fixed or reasonably objective standards and procedures for hiring; the aptitude test scores of some white applicants were fraudulently raised; some white applicants were hired without testing; and whites were given preference in summer employment. Job assignment practices were even more reprehensible. Over 80 per cent of black workers were placed in 11 departments, which contained the hotter and dirtier jobs in the plant. Blacks were excluded from higher paying and cleaner jobs. All of the defendants were aware of this racial discrimination. Even within a department, the pattern continued. In the Coke Ovens Department the blacks were assigned for the most part to the two poorest paid and least desirable of the four seniority units. Similar preferential treatment was given to whites in the choosing of apprentices and in the selection of supervisors.

All of this is a very brief summary of a general pattern of racial mistreatment that had existed at the Lackawanna plant for many years. There is no need to continue with a further description. It is enough to say that a sorry picture emerges, made no less so by the undoubted cooperation of Bethlehem with the Government once the investigation had commenced. The fact is that the Lackawanna plant was a microcosm of classic job discrimination in the north, making clear why Congress enacted Title VII of the Civil Rights Act of 1964.[2]

At trial, the major question was whether the seniority and transfer provisions of the collective bargaining agreement perpetuated the effects of the years of discrimination. Up to a decade ago, seniority at the Lackawanna plant had been departmental rather than plant-wide. That is, for purposes of layoff, recall and promotion seniority had been based on the time spent within a department or seniority unit rather than on the time elapsed from original employment. In 1962, this was altered somewhat for purposes of layoff and recall. "Pool areas" were established, consisting of the lower paid jobs of one or more departments; an employee about to be laid off in his department could exercise plant-wide seniority and transfer into a "pool" job.

---

1. While "department" and "seniority unit" are not synonymous, we will treat them as identical except where otherwise indicated.

2. See generally M. Sovern, Legal Restraints on Racial Discrimination 3–8, 61–102 (1966) ; C. Silberman, Crisis in Black and White 234–238 (1964).

Before 1962, employees had no right to transfer between departments. With the establishment of the pool areas, workers were allowed to use plant seniority to bid on job vacancies in another department sharing the same pool, if the employee was qualified to perform the work and the vacancy had not otherwise been filled. Usually such openings were filled by promoting the most senior worker in the job immediately below the vacancy. Therefore, the only jobs available for intra-pool transfers were generally at the low paid, entry level. In 1965, similarly limited plant-wide transfer rights became available allowing transfers to lower level jobs in any department that had not been filled by an intra-pool transfer.[3] Employees who transferred under either plan lost accrued seniority for purposes of promotion, and were paid at the rate for their new entry level jobs. Even these limited transfers were not permitted among the four seniority units of the Coke Ovens Department until 1968.

Before Chief Judge Henderson, the Government argued that the combined effect of these arrangements was to keep blacks in the jobs to which they had originally been assigned for racial reasons and that the seniority and transfer provisions of the labor agreements were therefore improper. Defendants argued that these practices were typical of the steel industry, were required for reasons of safety and efficiency and had not been instituted or continued for discriminatory reasons. Chief Judge Henderson, to a great extent, agreed with the Government. Thus, the judge found:

In other words, an employee who chooses to exercise either of these transfer rights must forfeit all of the benefits of seniority which he had accrued in his pre-transfer position, such as pay rate, promotion opportunities, protection against demotion, job selection, and enter the new unit as a new man, generally going to the entry level job.

The court finds as fact that the transfer and seniority system negotiated in the 1962, 1965 and 1968 Master Agreements by the company and union, operates (as described above) in such a way as to tend to lock an employee into the department to which he has been assigned. This lock-in effect becomes stronger as an employee's length of service increases in a department. This means that the longer a Negro has worked in the hot and dirty department to which he was admittedly discriminatorily assigned, the more he has to lose by transfer.

\* \* \* \* \* \*

The prohibition against transfers [within the Coke Ovens Department] \* \* \* was instituted for the purpose of discriminating against Negroes. Local 2601's acquiescence therein established that prohibition as part and parcel of the Coke Ovens seniority system. The Coke Ovens unit seniority system and prohibition against transfer had the purpose and effect of segregating Negroes within the Coke Ovens and denying them equal opportunity of employment in the Coke Ovens.

312 F.Supp. at 985–986, 989. Concluding from these findings that the seniority and transfer provisions tended to perpetuate the effects of Bethlehem's discriminatory practices, the district court held in substance that they were "unlawful employment practices" under Title VII. 42 U.S.C. § 2000e–2.

As for the admitted discriminatory practices in hiring and in job, apprenticeship and supervisory assignments, the district court, for the most part, adopted the relief to which the parties

3. These transfer rights are embodied in an industry wide master agreement negotiated between representatives of the International Union and representatives of the steel industry. The local unions and the individual companies apply the master agreement in accordance with the customs and usages of each plant. The seniority and transfer provisions challenged in this case were included in the 1962, 1965 and 1968 Master Agreements.

had stipulated. The court ordered appellees to establish objective criteria for hiring and promotion, to administer the apprenticeship and related programs in a non-discriminatory fashion, and to report to the court and to the Government the steps taken to comply with the decree. As for the seniority and transfer provisions, the court expanded the contractual transfer rights of all employees working in the 11 departments that had been the focus of the discriminatory practices. Employees in these departments, who were hired before October 1, 1967,[4] were given priority transfer rights, under the collective bargaining agreement, into any of the other departments. Moreover, within the Coke Ovens Department, employees discriminatorily assigned to two seniority units were given similar priority transfer rights into the two other units of that department that contained more desirable jobs.[5] To further increase mobility, the judge also ordered defendants to diminish the number of pool-areas in the plant.[6]

However, the judge did not grant all the relief sought by the Government. The court refused to order that (1) future transferees from the 11 departments should be paid in their new jobs at a rate at least equal to their average hourly earnings in their former jobs,[7] and (2) in their new jobs, the transferees should get the benefit of plant rather than unit or department seniority for all purposes. The judge's principal reasons for denying such rate retention and seniority carryover apparently were

that the present seniority and transfer system was not a complete deterrent to transfer, and that other employees would be treated unfairly and might become disgruntled if the system were changed as the Government requests.

The Government appeals, claiming that the order of the district court is in some respects too broad and in others too narrow. The most significant of its objections are in the latter category. We discuss these and other issues in Parts III and IV of this opinion. In Part V, we summarize the order that we believe should be entered.

## II.

Before considering the appropriate relief for the violations found and even though there is no appeal either by Bethlehem or the unions, we think it important to discuss briefly Chief Judge Henderson's conclusions that the seniority and transfer provisions of the collective bargaining agreements violated Title VII of the 1964 Civil Rights Act. We do so because the judge dealt with basic issues in a Title VII case that may recur in other proceedings in this circuit.

Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race * * *" or from limiting, segregating or classifying an employee "in any way which would deprive or tend to deprive any individual of employment

---

4. This is the date when Bethlehem voluntarily ceased its discriminatory practices other than those embodied in the seniority and transfer provisions.

5. The court also prohibited Bethlehem from subjecting potential transferees under the decree to any unusual tests of their qualifications for the jobs to which they wished to transfer.

6. Defendants have apparently begun compliance with the district court's order. Moreover, they have voluntarily increased a transferee's "bump back" rights. A transferee now has an absolute right to

return to his former department within 60 days without loss of seniority earned in that department. In addition, a transferee will continue to earn seniority in his former department for two years and, if laid off from his new department, may return to his former department with full seniority.

7. If the new department or unit does not have a job that pays as well as the transferee's former job, the Government requests that he be paid at the rate of the top job in the department.

opportunities or otherwise adversely affect his status as an employee, because of such individual's race." [8] From Judge Butzner's seminal opinion in Quarles v. Phillip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968), to the Supreme Court's recent and first decision on the merits of a Title VII race discrimination case, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971), a basic question has been whether racially neutral practices that perpetuate the effects of past discrimination are "unlawful employment practice[s]" as defined in that section.[9] The issue before Chief Judge Henderson was whether the seniority and transfer system at the Lackawanna plant, although racially neutral on its face, violated the Act.

 The effect of Bethlehem's admitted, numerous discriminatory practices over many years was to force blacks into the 11 less desirable departments in the Lackawanna plant solely on the basis of race. Although these overt practices were finally discontinued after October 1, 1967—over two years after the effective date of Title VII and in response to governmental investigation—the seniority and transfer provisions perpetuated their effects in two ways. First, they tended to lock discriminatorily assigned employees into their jobs. In order to transfer to a formerly "white" department these employees were required to suffer an economic penalty, forfeiture of seniority rights and pay levels earned in the "black" department. The former was due to the use of departmental seniority, the latter to the fact that the transferee's new job was at a low paid entry level in the new department. Thus, to obtain an opportunity that had been denied them because of race, these employees had to be willing to give up what was already theirs because of service in the plant. Second, a transferee to a "white" department would never be able to reach the level of a white employee already there. For example, if a black and a white employee had been hired at the same time and the latter had been assigned to the more desirable "white" department, but the black had not been so assigned, the white started to accumulate department or unit seniority in that department but the black did not. Even if the black were given the chance years later to transfer into the "white" department, the earlier discriminatory job assignment had denied him the chance to earn seniority up to that time in the "white" department. Therefore, the use of departmental or unit seniority for purposes of promotion in the formerly "white" department continued the effect of the earlier discriminatory practice. See Local 189, United Papermakers v. United States, 416 F.2d 980, 988–991 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970).

It is true that section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) provides that "it shall not be an unlawful employment practice for an employer to apply different * * * terms [or] conditions * * * of employment pursuant to a bona fide seniority" system "provided that such differences are not the result of an intention to discriminate because of race * * *." [10] Chief Judge

8. 42 U.S.C. § 2000e–2(c) defines as unlawful employment practices similar acts when done by a labor union.

9. See also Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970); United States by Clark v. Dillon Supply Co., 429 F.2d 800 (4th Cir. 1970); United States v. Local 38, IBEW, 428 F.2d 144 (6th Cir. 1969); United States v. Local 36, Sheet Metal Workers, 416 F.2d

123 (8th Cir. 1969); Local 189, United Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U. S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970).

10. 42 U.S.C. § 2000e–2(h) provides, in part, that:
Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or

Henderson held, 312 F.Supp. at 993, that this section does not apply to this case, reasoning that a seniority system based on earlier discriminatory job assignments into various departments is not "bona fide." See *Local 189, supra,* 416 F.2d at 988, 994–995; *Quarles, supra,* 279 F.Supp. at 514–519. The pervasiveness and longevity of the overt discriminatory hiring and job assignment practices, admitted by Bethlehem and the unions, compel the conclusion that the present seniority and transfer provisions were based on past discriminatory classifications. See generally Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1155–1166 (1971); Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967). Accordingly, Chief Judge Henderson's conclusions that the continued use of the seniority and transfer provisions perpetuated discrimination and therefore violated the Act were surely correct.

### III.

This brings us to the issue raised by this appeal: whether the district court should have ordered the rate retention and seniority carryover for transferees that the Government urged. Before considering the arguments of the parties, analysis of what the Government is not seeking may provide perspective. The Government's complaint, in the face of long-seated and utterly indefensible racial discrimination against various employees, did not ask for back pay for any employee. Nor did it seek relief for any potential employee who had not been hired because of race.[11] Continuing violations having been found, the Government now seeks only greater incentive to job mobility for those present employees who have been treated illegally in the past. But the right of transfer or to bid upward, under the Government's proposals, would not be unlimited or unconditional. A transfer would only be to fill vacancies; there would be no bumping of "white" employees out of a job. In addition, the transferee would have to be qualified to fill the job and go through the same progression as other employees. There would be no right to leapfrog over intermediate positions and bid for a job at the top. Thus, it is clear that the relief sought by the Government is moderate.[12] In broad outline, the Government's argument is that the limited remedy of priority right to transfer, ordered by the district court, does not remove the effects of past discrimination. If discriminatorily assigned employees cannot keep in their new jobs their former rate of pay and seniority, few will transfer and those that do will suffer an economic penalty and be forever behind their white contemporaries. In short, the remedy granted below will not "insure the full enjoyment of the rights" secured by Title VII, 42 U.S.C. § 2000e–6(a).

privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. * * *

11. This characterization is true with one possible exception. The relief granted to remedy discrimination in the apprenticeship program apparently applies to blacks who applied but were never employees at the Lackawanna plant.

12. For discussions of possible remedies under Title VII, see Cooper & Sobol, *supra,* at 1632–36; Developments in the Law, *supra,* at 1163–1164, 1269.

In response to this, appellees make a number of arguments.[13] They say that there is no evidence that black members of six of the 11 departments were discriminatorily assigned or that their departments are less desirable; that even in the remaining five departments, many would have been assigned there in any event; that the scope of relief was for the discretion of the district court judge and that he did not abuse it; that alteration of the plant's seniority system is prevented by section 703(h) of Title VII; and that the Government's proposed remedy would seriously undermine morale, efficiency and safety in the plant. None but the last of these arguments requires extended discussion.

■ The point that as to six departments there is no evidence of discrimination or that the jobs are less desirable borders on the frivolous. It is enough to say that the district court found to the contrary, and appellees have not appealed from those determinations. As to the other five departments, it is true that some of the black employees might have been assigned there even under the best of systems. But there is no apparent way of knowing that, or determining now who they would be,[14] and appellees offer none. The discrimination found illegal here was to a group; group remedy is therefore appropriate. Cf. United States v. Board of Education, 372 F. 2d 836, 866 (5th Cir. 1966), aff'd on rehearing *en banc*, 380 F.2d 385, cert. denied, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed. 2d 104 (1967).

■ Regarding the scope of review, there apparently is a dispute between the parties with the Government claiming that we are not limited to searching for abuse of discretion. However, we do not think it necessary to resolve the issue. In denying the relief sought by the Government, Chief Judge Henderson relied in substantial part on the fact that the present seniority and transfer system was not "a complete deterrent" to transfer. 312 F.Supp. at 984. However, this puts it backwards. Even a discriminatory system that did not completely deter transfers but only discouraged them should be changed. The correct criterion in fashioning a remedy under Title VII is what would be necessary to insure sufficient incentive to transfer so that the effects of past discrimination would not be perpetuated. In addition, the test here must also look to advancement after transfer, so that an employee can achieve his "rightful place." That is, relief under the Act should give discriminated employees, as future vacancies arise, the opportunity to obtain the jobs that they would have earned had there been no discrimination. *Local 189, supra,* 416 F.2d at 988; Cooper & Sobol, *supra* at 1602–1629; Note, *supra.*

■ Rate retention and seniority carryover have both been used to correct continuing discriminatory effects similar to those caused by the seniority and transfer provisions at the Lackawanna plant. Griggs v. Duke Power Co., 420 F.2d 1225, 1236–1237 (4th Cir. 1970) (seniority carryover), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Robinson v. Lorillard Corp., 319 F.Supp. 835, 839, 843 (M.D.N.C.1970) (rate retention and seniority carryover); Clark v. American Marine Corp., 304 F.Supp. 603, 608 (E. D.La.1969) (rate retention and seniority carryover); United States by Clark v. Local 189, United Papermakers, 301 F. Supp. 906, 919, 923 (E.D.La.) (rate retention and seniority carryover), aff'd, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 108 (1970); *Quarles, supra,* 279 F.Supp. at 521 (seniority carryover).

13. For purposes of convenience in discussion, we have not treated separately the arguments of the company and the unions, although they do differ in emphasis; e. g., the company stresses the effects of the Government proposals on safety and efficiency in the plant; the union discusses the effect on other employees.

14. Appellee unions concede as much. Brief of Appellee unions at 20–21.

Such relief will remove any racially based constraints against transfer and allow the transferee, if qualified, to be promoted within a reasonable time to his "rightful place," a job in a "white" department equal to that of his white contemporary who did not suffer a discriminatory assignment, without displacing another employee from his present job. Unless some rate retention and seniority carryover is granted to a transferee, the incentive to transfer will remain low for the very reasons that the seniority and transfer provisions of the plant were found to have perpetuated discrimination. That is, a discriminatorily assigned employee will have little incentive to transfer if he loses money or job seniority by doing so. Indeed, appellees do not argue that seniority carryover and rate retention will not be an important inducement to transfer. As indicated below, they argue just the reverse, that the incentive will be too great. Therefore, since we believe that the district court used erroneous criteria in applying Title VII, the order below should be modified even under the abuse of discretion test of review.

■ Appellees also argue that the seniority system at the plant is protected by section 703(h) of the Act, 42 U.S.C. § 2000e–2(h), quoted in note 10 *supra*, so that any alteration of seniority rights to grant the relief requested by the Government would be improper. There are a number of reasons why we decline to accept this view. The statutory exception only applies to a "bona fide" seniority system, and Bethlehem has not appealed from the basic conclusion of the district court that the seniority system did not deserve that description. Even more important, the district court's determination was, as already indicated, obviously correct. Moreover, relief already granted, transfer priority for employees in the 11 departments, is itself an alteration of the seniority system. Yet, Bethlehem raises no objection to this remedy even though logically it is subject to the same defect as the additional relief still sought by the Government. Bethlehem also relies on portions of the legislative history of the Act in which Senators Clark and Case, co-floor managers of the bill in the Senate, indicated in an interpretative memorandum that legislative intent was not to give blacks "special seniority rights at the expense of the white workers hired earlier." [15] That memorandum, however, in focussing on formerly white-only plants, seems to say at most that the seniority of a white on a job will not be affected by the claims of blacks hired after he was. As we make clear below in discussing the precise relief to which we believe the Government is entitled, the discriminatorily assigned employees who transfer will not receive "special seniority rights" or "super-seniority." Their seniority rights will be no greater than that accorded more fortunate employees. Both groups will bid against each other for vacancies on the basis of plant-wide seniority; an earlier-hired white employee will have greater seniority than a later-hired black. In any event, essentially we agree with Judge Butzner that "Congress did not intend to freeze an entire generation of Negro

---

15. The interpretative memorandum stated as follows:

Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. *He would not be obliged—* or indeed, permitted—to fire whites in order to hire Negroes, or to prefer Ne-

groes for future vacancies, or, *once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier.* (However, where waiting lists for employment or training are, prior to the effective date of the title, maintained on a discriminatory basis, the use of such lists after the title takes effect may be held an unlawful subterfuge to accomplish discrimination.) [Emphasis added.]
110 Cong.Rec. 7213 (1964). See also *id.* at 7207.

employees into discriminatory patterns that existed before the act." *Quarles, supra,* 279 F.Supp. at 516. Accord, *Local 189, supra,* 416 F.2d at 987–988. See Cooper & Sobol, *supra* at 1607–1614.

■■ Appellees' last group of objections are more substantial. Appellees fear that the irresistible advantage of rate retention and seniority carryover will lead to a wholesale depopulation of the 11 departments, that dangerous, skilled jobs will be filled by incompetents increasing the injury rates, that the preferential treatment of some employees will lead to labor unrest, and that the increased cost of production will render the plant uncompetitive. In sum, appellees claim that the Government's requested relief will destroy the efficiency and safety of the Lackawanna plant and that modification of present practices and of the district court order is therefore prohibited by what has become known as the "business necessity" exception to the requirements of Title VII. That doctrine is not referred to in the Civil Rights Act of 1964, although section 703(h), quoted in note 10 *supra,* is clearly concerned with the ability of a business to continue to operate efficiently. The doctrine has been expressed as follows:

> When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, those policies must yield, unless there is an overriding legitimate, non-racial business purpose.

*Local 189, supra,* 416 F.2d at 989. We accept that definition, but in the context of this case the "business necessity" doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. Clearly such a result is not correct under Title VII. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 249 (10th Cir. 1970). Necessity connotes an irresistible demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. *Local 189, supra,* 416 F.2d at 989. If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued.

Thus, it is not enough that the seniority system at the Lackawanna plant is, as appellees argue, meant to insure orderly and efficient job mobility so that "after transfer the employee will advance in his new line of progression in an orderly manner, developing and building on new skills as he moves from job to job." [16] While these are legitimate, non-racial business purposes that directly serve safety and efficiency, they are the goals of any reasonable transfer and seniority system and do not by themselves prevent its alteration. The seniority and transfer provisions at the plant have been found to perpetuate past discrimination, and the use of rate retention and seniority carryover will substantially eliminate these discriminatory effects. Therefore, the crucial question must be whether the basic goal of the seniority system will necessarily be frustrated by these remedies. It is perfectly clear that this will not be the case. An unqualified worker need not be promoted whether or not he is a transferee under the district court's order. This is expressly provided in the 1968 Master Agreement and nothing in the district court's or in our opinion alters that fact.[17] Transferees will not move di-

---

16. Brief for Appellee Bethlehem at 30.

17. Bethlehem argues that the ability requirement in the collective bargaining agreement, Art. X, § 1, 1968 Master Agreement, will not afford sufficient protection because it is too difficult to apply and because of the narrow interpretation given to it by arbitrators under the collective bargaining agreement. We agree that it is probably easier to advance employees solely on a length of service re-

rectly to high or middle level jobs nor displace workers from jobs presently held, nor jump from low to higher jobs.[18] Under the Government's proposals, a transferee has priority rights only with respect to jobs in formerly "white" departments that are not otherwise filled in the normal seniority procedures. Accordingly, transfers will be to low-skilled, entry-level jobs. A transferee will be promoted from those jobs in the normal job-by-job fashion, moving up the progression line only as a job immediately above him becomes vacant.

Appellees also argue that the morale of employees who did not suffer discrimination will suffer if rate retention and seniority carryover are ordered. But in the context of this case that possibility is not such an overriding business purpose that the relief requested must be denied. Assuming *arguendo* that the expectations of some employees will not be met, their hopes arise from an illegal system. Moreover, their seniority advantages are not indefeasibly vested rights but mere expectations derived from a bargaining agreement subject to modification. *Quarles, supra,* 279 F. Supp. at 520. Cf. Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Indeed, appellees themselves recognized this when they provided in the 1968 Master Agreement[19] for adjustment of conflicting seniority claims in the event of the mergers of plants or departments. If relief under Title VII can be denied merely because the *majority group of employees,* who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed. Cf. Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

Appellees claim that rate retention will destroy an industry wide Job Classification Program,[20] but we do not agree. Exceptions to the "equal pay for equal work" doctrine have been made in the past. When the program was first put into effect, "red circle rates"—another way of describing limited rate retention —were common because it was agreed that no employee should suffer loss of pay merely because his job was classified at a lower rate. The 1968 Master Agreement[21] provided that an employee temporarily assigned for Bethlehem's convenience to a job other than his regular job, when work is available to him in his regular job, "shall receive the established rate of pay" for either the temporary job or his permanent job, whichever is higher. The temporary rate retention requested here[22] is not unprecedented either at this plant or in other instances where Title VII relief has been granted. See cases cited at p. 3727 *supra.*

We do not say that appellees' concerns over the effects of rate retention and seniority carryover are manufactured or advanced in bad faith. But most of them can be met by the carefully limited order suggested by the Government. Thus, appellees fear that some transferees, content with doing a relatively easy job at a high rate of pay, would decline any further promotions, and that seniority carryover would allow transferees to "bump" employees from their

---

quirement, but we do not accept Bethlehem's self-serving statement that enforcement of the ability requirement is useless. Its presence in the agreement indicates that one party, probably Bethlehem, thought it was useful.

18. The Government has stipulated that each job in a line of progression provides training for the next highest job.

19. Art. X, § 9.

20. Under the program, begun in 1944, jobs in the steel industry are classified based on 12 specific criteria, including working conditions, hazards and responsibilities. Each job is graded on a numerical scale and equal wages are paid for jobs with the same classification.

21. Art. IV, § 5.

22. This relief will be temporary because the transferee will most likely advance quickly to a job paying as much as or more than his red circle rate. See 312 F.Supp. at 985.

jobs. But, if a transferee knows that he will lose his red circle rate if he refuses a promotion, as the Government suggests, there will be little incentive to stay on a job requiring little effort but giving high pay because of rate retention. Moreover, because plant seniority will only be used in bids upward for vacancies occurring in the normal course of business, i. e., vacancies caused by the death, retirement or transfer of an incumbent or by creation of a new job, an employee will not be "bumped" out of his job in such situations by a transferee. Regarding displacements caused by layoffs, the Government suggests that, as workers are recalled following a layoff, all employees should assume the same positions relative to each other as they held immediately prior to the layoff. Although plant seniority of transferees will remain as a factor in layoffs, this suggestion will limit the speed with which a transferee can be promoted and the unsettling effects of seniority carryover during periods of layoff and recall. Other fears of appellees are based upon inaccurate assumptions, e. g., that a transferee can go into a job for which he is not qualified or that transferees will have "super-seniority." In short, upon a careful examination of the Government's proposals and the company's past practices, we conclude that the business necessity doctrine does not require denial of the proposed relief.

Appellees also rely on the decision of the Hearing Panel in the Matter of Bethlehem Steel Corporation, OFCC Dkt. No. 102–68, issued on December 18, 1970, and the decision in United States v. H. K. Porter Co., 296 F.Supp. 40 (D.C.Ala.1968), appeal docketed, No. 27,703, 5th Cir. March 14, 1969. The former concerned the seniority and transfer provisions in use at Bethlehem's Sparrows Point (Maryland) plant. Under Executive Order 11246, companies that deal with the federal government are re-quired to include in their contracts the pledge that they will not discriminate against any employee "because of race, creed, color, or national origin." [23] The Office of Federal Contract Compliance (OFCC) of the United States Department of Labor is charged with the responsibility for assuring that this pledge is obeyed. The OFCC charged Bethlehem with violating the pledge because, *inter alia*, the seniority system at Sparrows Point perpetuated the effect of the company's prior policy of discriminatorily assigning employees. Bethlehem refused to comply with the OFCC's direction that blacks be allowed to transfer with rate retention and seniority carryover, and requested a hearing. The Hearing Panel's decision essentially agreed with the district court's opinion in this case.[24] The Panel found that the seniority system did perpetuate the effects of past discrimination but held that the rate retention and seniority carryover provisions were not appropriate relief, because of the exigencies of business necessity. One Panel member dissented on the relief issue.

We agree that the issues and facts involved in the Sparrows Point decision, although arising in the context of a compliance hearing under Executive Order 11246 rather than a Title VII suit, are similar to those in this case. For reasons stated above, however, as well as in the dissent to the Panel's decision, we do not find persuasive the Panel's analysis of the business necessity exception. The Panel found support for its conclusion in Whitfield v. United Steelworkers of America, Local 2708, 263 F.2d 546 (5th Cir.), cert. denied, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959), and *H. K. Porter, supra*, although it did "not accept the legal reasoning and theory of the two cases," and relied heavily on the district court opinion in this case. *Whitfield* construed a union's duty of fair representation under the doctrine of

---

23. 3 C.F.R. 339, 340 (1964–65 Comp.).

24. The Panel decision is submitted to the Secretary of Labor who, after receiving the written positions of the parties, will decide whether to adopt the Panel's conclusions.

Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); its effect on the scope of relief to be granted in Title VII cases, however, has been limited by the Fifth Circuit. United States v. Hayes International Corp., 415 F.2d 1038, 1042 n. 6 (5th Cir. 1969). *H. K. Porter*, now on appeal to the Fifth Circuit, is not in accord with a majority of the decisions and has been criticized.[25] Moreover, it can be distinguished from this case. There the district court found that the seniority system did not violate Title VII because it did not perpetuate the effects of past discriminatory assignments by *locking* employees into their original jobs. 296 F.Supp. at 64. Also, in that case, the Government sought, *inter alia*, plant-wide bidding for jobs, relief that would avoid having transferees advance through a line of progression of functionally interrelated jobs, each one providing training for the next. In this case, however, the remedy sought would not allow a transferee to leapfrog over jobs in a line of progression.

## IV.

Accordingly, we believe that the relief requested by the Government with regard to seniority carryover and rate retention should have been granted. The Government also raises three other issues on appeal. It claims that the district court should have extended the relief to employees who had been discriminatorily assigned to the 11 departments but thereafter had exercised their limited right to transfer and, therefore, are not within the scope of the order. We agree. These employees originally suffered the same discrimination as those who have not transferred. They should not be denied remedial relief, either as to rate retention or as to seniority merely because they were not completely deterred from transferring. They still suffer the effects of discrimination because they are unable to reach the same level as their white contemporaries. See *Quarles, supra*, 279 F.Supp. at 521.

Second, the Government contends that it was error for the district court to extend relief to white employees in the 11 departments, who the district court found were also discriminatorily assigned before October 1, 1967. The court justified this finding by citing some evidence which showed at most that at some indeterminate time in the past certain ethnic groups congregated in certain departments because the man in charge "tended to hire * * * people who were friends of his or from his ethnic community * * *." This fell far short of proof that any of the white employees in the 11 departments were there because they could not obtain jobs elsewhere in the plant. In brief, there was simply insufficient evidence to support the district court's finding that any of the whites in the 11 departments were ever the victims of discrimination prohibited by Title VII.

Finally, the Government argues that paragraph 7 of the district court's order was error insofar as it extended relief to white applicants who were denied entry to the apprenticeship program during the period January 1, 1964 to October 1, 1967, and who were at least as qualified as the least qualified white accepted during that same period. Based on the stipulated facts, the district court entered a pre-trial order setting forth the relief, agreed to by the Government and Bethlehem, that was to be included in the final decree of permanent injunction. Although the pre-trial order relief based upon the discrimination in the apprenticeship program applied to "[e]ach Negro applicant for the apprenticeship," the final order applies to "[e]ach applicant." We agree with the Government that no reason was given for the change and that there was no proof that Bethlehem rejected any white applicants to the apprenticeship program on the basis of "religion, sex, or national origin." Accordingly, paragraph 7 of

---

25. E. g., Cooper & Sobol, *supra* at 1622–1623, 1627–1628.

the district court's order should apply only to rejected black applicants.

## V.

In conclusion, the objective of the order to be entered here must be to remove the discriminatory effects of a transfer and seniority system that violated the Act. Appellees have not shown that the system in use at the Lackawanna plant is so essential to safety and efficiency that it cannot be modified in the ways suggested by the Government. On the contrary, a carefully drawn order providing for rate retention and seniorits carryover can protect both the rights of employees who have suffered discrimination as well as the legitimate business interests of the appellants.

An appropriate order here should grant an employee who has been discriminated against ("a transferee"), at least the following additional relief: (1) A transferee shall receive, in his new position, pay equal to the pay in his former permanent position and shall continue to be so paid until he reaches a position whose pay scale is greater. If no job in his new department or unit has a rate as high as his former position, then he shall receive the rate of the highest level job in that department or unit. Because the rate retained is that of the transferee's permanent job, he shall not retain any temporary pay increase if he transfers after a temporary promotion. (2) A transferee shall be permitted to exercise plant seniority for all purposes following transfer, except as otherwise set forth herein. When a transferee competes on the basis of seniority for vacancies occurring in the normal course of business, seniority for all bidders shall be computed on the basis of plant, rather than unit or department, seniority. Only workers qualified to fill a higher job may use plant seniority to advance. As workers are recalled after a layoff, all employees shall assume the same positions relative to each other as they held immediately prior to the layoff. (3) A transferee's right to transfer with seniority carryover and rate retention may be exercised only once, and only during the next two years. If he exercises that right within that period, the transferee's protection of seniority carryover and rate retention shall continue in accordance with the other provisions in the order. (4) A transferee shall lose his privilege of rate retention if he refuses a promotion in his new unit or department.[26]

While the district court order, so modified, may cause inconvenience or annoyance, we believe that it will not disrupt the safety and efficiency of the Lackawanna plant. Because a transferee will have only one opportunity of limited duration to transfer to a formerly "white" department, the Lackawanna plant will not be thrown into a chaotic game of musical chairs. There will be no right to transfer on an "hour-to-hour and day-to-day basis," as appellees fear. Nor will any employee have superseniority or be entitled to a job for which he is not qualified. But the order so modified will give an employee who has suffered discrimination the opportunity to reach his "rightful place" in the plant. That result will accord with the noble purpose of the Civil Rights Act of 1964 to eradicate racial discrimination in employment in the north as well as in the south. We believe that the order so modified is reasonably designed to accomplish that end and is necessary to its fulfillment.

Case remanded for entry of a new order consistent with this opinion.

26. Of course, we do not preclude the parties from agreeing to other changes in the order or the district court from changing the order in other respects for purposes of clarification.