EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

BETHLEHEM STEEL CORPORATION, a Corporation; Local 2601, United Steelworkers of America; Local 2602, United Steelworkers of America; Local 2603, United Steelworkers of America; Local 3144, United Steelworkers of America; and United Steelworkers of America, Defendants.

No. CIV–1967–432C.

United States District Court, W.D. New York.

March 9, 1984.

Equal Employment Opportunity Commission and United States Department of Justice, Civil Rights Div., Federal Enforcement Section (Richard Ugelow and Elaine Bloomfield, Washington, D.C., of counsel), for plaintiffs.

Windels, Marx, Davis & Ives, New York City (Anthony A. Dean, New York City, of counsel), for defendant Bethlehem Steel Corp.

Bredhoff, Gottesman, Cohen & Weinberg, Washington, D.C. (Michael Gottesman, Washington, D.C., of counsel), for defendants Locals 2601, 2602, 2603, 2604, 3144, United Steelworkers of America and United Steelworkers of America.

Arcangelo J. Petricca, Buffalo, N.Y., for individual claimant Steelworker Pickering.

Paul Shatkin, Buffalo, N.Y., for individual claimant Steelworker McRae.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N.Y. (John R. LoGalbo, Buffalo, N.Y., of counsel), for individual claimant Steelworker Sibiga.

Clark, Wulf & Levine, New York City (Kathleen Peratis, New York City, of counsel), for individual Claimant Steelworkers Stewart, Gregory, Washington, Coleman, Verbanic, Johnson, Dixon, Davis, Pope, Washington, Lewis, Williams, Royster, Lamar, and Lockett.

Clifford Braxton, Joseph Conner, Curtis Minniefield, Robert North, Sherman Price, Jr., James Robinson and Willie Thomas, pro se.

CURTIN, Chief Judge.

Since the inception of this litigation, the complexity of this case has demanded the innovation of procedural devices to facilitate reconciliation. The present requests by individual Bethlehem Steel employees to alter decisions of the Special Master assigned to these complaints and to alter decisions of the Amended Decree Implementation Committee following submission to Committee reconciliation are procedurally unusual, but only because the shape of this litigation has grown beyond ordinary case precedent.

Before addressing the individual requests for *de novo* review and/or interference, this lawsuit's procedural history must be summarized.

On April 13, 1970, after a trial on the merits, Bethlehem Steel was permanently enjoined from engaging in a pattern and practice of discrimination against black employees on the basis of race of the Lackawanna, New York, plant. *United States v. Bethlehem Steel*, 312 F.Supp. 977 (W.D.N.Y.1970). That decree was amended on October 14, 1971, to incorporate additional remedies prescribed by the United States Court of Appeals for the Second Circuit in *United States v. Bethlehem Steel Corp.*, 446 F.2d 652 (2d Cir.1971); *United States v. Bethlehem Steel*, No. 67–432, *slip op.* (W.D.N.Y. Oct. 14, 1971). The "Amended Decree" modified the seniority system in order to provide increased opportunities for black employees hired before October 1, 1967 (the date this suit was filed by the United States Justice Department). Additionally, those black employees had to have

been originally assigned to 11 specific departments. Under the provisions of Paragraph 5(a)(4) of that decree, plant seniority was prescribed as the measure of continuous service to be used for purposes of promotions, demotions, layoffs, and recalls. This seniority was to be employed wherever an affected class member transferee under the decree was in competition for a job in his new unit or department. However, there were certain exceptions concerning recalls and layoffs. Those employees were required to progress in regular steps through lines of progression but could now use their seniority plant date as the measure of competition.

During 1972, two clarifying orders were issued which included a provision to extend the Amended Decree to Department 311, Plant Patrol. *EEOC v. Bethlehem Steel,* No. 67–432, *slip op.* (W.D.N.Y. Feb. 10, 1972 and July 26, 1972) (clarifying orders). However, that department's bargaining agent, Guards Local 23332, AFL–CIO, was not made a party defendant.

On September 25, 1973, upon joint motion of the parties, this court entered an order establishing an Amended Decree Implementation Committee [ADIC] to resolve complaints and grievances arising from the implementation of the Amended Decree in a manner consistent with that decree. The purpose of the ADIC was to resolve, without resort to the court, any problems which might arise in the effectuation of the decree. Any controlling decision reached by the ADIC had to be by unanimous decision.

On April 12, 1974, the United States, on behalf of the Secretary of Labor and the Equal Employment Opportunity Commission [EEOC] filed a complaint in Alabama Federal Court against nine of the nation's major steel producers and the United Steelworkers of America. *United States v. Allegheny Ludlum Industries, Inc.,* No. 74–P339 (N.D.Ala. April 12, 1974) (complaint filed). Of course, the effects of this suit were felt industry-wide, including Bethlehem Steel's Lackawanna Plant.

On April 12, 1974, the same day the complaint was formally filed, two consent decrees were entered by the Alabama District Court. The first involved employment practices, to which both the companies and unions were parties, and the second concerned practices under the exclusive control of the companies.

Consent Decree I required the use of a measure of continuous service which is not less than an employee's plant continuous service. It also established a bidding and transfer system and provided rate retention protection for employees transferring into new units where their initial entry job was compensated at a lower rate than the job for which they transferred. In addition, Consent Decree I created a system or mechanism for the detailed and individualized review and reform of local seniority rules and departments. The provisions of Consent Decree I were designed to correct the continuing effects of past discriminatory hiring, initial assignment, promotion, and transfer practices. Their adequacy and legality, as well as that of other provisions of Consent Decrees I and II, were challenged by three organizations, four individuals, and six groups of plaintiffs. The district court found those challenges to be without merit, and the Fifth Circuit affirmed. *United States v. Allegheny Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

On July 12, 1974, the EEOC was substituted for the United States in this litigation. On July 26, 1974, this court, upon joint motion of the parties, entered an order which made Consent Decrees I and II applicable to the Lackawanna Plant, subject to certain modifications. Under the provisions of that order, Paragraph 5(a) of the Amended Decree remained in effect to the extent that its transfer and rate retention provisions were more beneficial to minorities. Paragraph 7 remained in effect until all pending applications of affected class members for the apprenticeship program reached final action. ADIC took priority over the provisions of Paragraph 10 of Consent Decree I. Existing recall practices and procedures under the Amended

Decree remained in effect, and in addition, such rules and practices were made applicable to all employees covered by Consent Decree I. The Amended Decree Implementation Committee [ADIC] remained in place, and a separate Implementation Committee was established under Consent Decree I [CDIC]. Although membership on the two committees was the same, the Alabama District Court had jurisdiction over the CDIC matters, while ADIC disputes belonged before this court. Many of the matters addressed by these committees were the same; yet, the ADIC handled any supervisory and non-bargaining union questions. Additionally, special transfer matters and plant patrol issues were addressed by the ADIC. A committee headed by EEOC representation at the Lackawanna Plant interviewed all grievants and directed them to either the ADIC or the CDIC or, in some cases, directly to Union grievance if the subject matter was not covered by this suit.

The CDIC's mandate in the July 26, 1974, order went beyond the intent of Consent Decree I by permitting it to function as had the ADIC, which was equipped with broad complaint resolution powers. All unresolved matters within the jurisdiction of the CDIC were to be referred to the Audit and Review Committee and, ultimately, to the Alabama district court for review. However, this court retained jurisdiction over all ADIC matters.

Before long, CDIC and ADIC complaints and grievances had reached impossible numbers. For this reason, in March of 1976, the parties initiated a special program by which additional representation of the Company, the Union, and the government was brought to Buffalo to assist the ADIC and the CDIC in reducing the caseloads.

In May of 1977, the two committees submitted revised procedures to the court. Despite improvements, the backlog of the committees continued to grow. On January 10, 1979, the government filed a motion to modify and restructure the operation of the two committees. After a hearing, this court issued an order which curtailed the activities of both committees. That May 21, 1979, order directed that future CDIC matters would be handled within the grievance procedure. The parties agreed that following October 25, 1979, all unresolved Consent Decree cases would be referred to the Audit and Review Committee. That committee then set up a task force to resolve the approximately 1,000 cases which remained pending on that date. Work progressed in resolving those matters.

Amended Decree matters remaining unresolved as of October 25, 1979, were referred to Special Master Lawrence E. Seibel (May 21, 1979, Order). He began holding hearings in January, 1980, and has issued decisions on all matters that were referred to him. The May 21, 1979, order also provided that any party or affected employee having objections could file a motion to modify or reject the Special Master's decision. Fed.R.Civ.P. 53. The court designed a *pro se* motion form to facilitate the process. Twelve such motions were properly filed and are presently before the court.

In addition, 26 individuals have requested review of unanimous decisions of the ADIC. This is permitted in accordance with a stipulation entered in October, 1979, which agreed to add a paragraph to committee decision letters. This paragraph merely attempted to incorporate the previous unwritten understanding that dissatisfied complainants could have review in the district court.

In order to review both the 12 Special Master requests and the 26 ADIC requests, this court directed that any of those persons wishing a hearing should inform the court on or before November 26, 1982, and appear before the court on December 10, 1982. One additional individual, Joseph Conner, who wished review of his ADIC determination, was later scheduled for a similar hearing on February 17, 1983.

In anticipation of this review, in April of 1981, all parties and complainants were asked to respond to this court's concerns about the appropriate standard of review. Submissions have been received from the

EEOC, Bethlehem Steel, the United Steelworkers of America, and from a group of supervisors who seek review of grievances originally handled by the ADIC.

Initially, this court must define the scope of review applicable to both the Special Master appeals and the ADIC appeals. That inquiry must begin with the letter and spirit of the orders which created the ADIC and Special Master review.

## I.

With respect to the ADIC determinations, the parties, meaning the Union, the Company, and the EEOC agreed in September, 1973, to adhere to the unanimous decisions of the ADIC. This particular dispute resolution mechanism was designed as a form of arbitration analogous to forums created by collective bargaining agreements. By design then, any review of ADIC unanimous decisions must be limited to the arbitrary, capricious, or abuse of discretion standard articulated in 9 U.S.C. §§ 10, 11.

It must be remembered that "[t]he purpose of arbitration is to permit a relatively quick and inexpensive resolution of contractual disputes by avoiding the expertise and delay of extended court proceedings." *Diapulse Corp. of America v. Carba, Inc.*, 626 F.2d 1108, 1110 (2d Cir.1980). Certainly, the ADIC was created to avoid protracted court battles over matters which could be resolved on a case-by-case basis.

It is significant to note that only the within-named individual employees now challenge the ADIC determinations. In fact, none of the tripartite ADIC membership now disputes the results.

Moreover, the May, 1979, order does not provide for *de novo* review by the court of unanimous ADIC decisions. Although the final paragraph preserves the right of a complainant to commence an independent lawsuit on claims arising out of ADIC determinations, "this Court will, where warranted, give substantial weight to the findings and determination previously made" by the ADIC. Certainly, any direct review by this court of ADIC matters is not de-

signed to prevent individuals from filing their own actions for the redress of discriminatory actions on the part of Bethlehem Steel.

Of the 26 requests to review the ADIC decisions, only 17 both gave notice pursuant to this court's October 1, 1982, order and appeared on December 10, 1982. Sixteen of those individuals were represented by counsel as a group. The remaining individual, James Pickering, also appeared with counsel. The positions of each of these 17 employees are essentially the same, permitting general address by this court. Mr. Conner appeared later in February of 1983.

▮▮▮▮ All 18 were supervisory employees of Bethlehem Steel who claimed they were affected by the Amended Decree. All of the individuals took their grievances before the ADIC, and each received what they consider an unfavorable determination. At the outset, it must be emphasized that these claimants were not limited to this requested avenue of review. Each could have brought an independent claim. Title VII does not foreclose an individual claim simply because the action was instituted by the EEOC. Instead, "[t]he EEOC's civil suit was intended to supplement, not replace, the private action." *General Telephone Co. v. EEOC*, 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980). In fact, three of these individual employees have filed separate actions under Title VII alleging discrimination, which is already the subject of the instant litigation. However, it must be remembered that the EEOC represents not only the public interest, but also "acts ... at the behest of and for the benefit of specific individuals." *Id.* Furthermore, a consent decree does not bar an individual from instituting a Title VII suit. *United States v. Jefferson Co.*, 720 F.2d 1511 (11th Cir. 1983).

For this reason, those individuals who now quarrel with the ADIC decisions did in fact have an advocate on the committee. Although they argue that their supervisory

positions prevented Union representation, under the circumstances, the EEOC could have adequately advanced their cause before the other committee members.

■ Generally, these claimants argue that the ADIC lacked subject matter jurisdiction over their cases. Specifically, 16 of the individuals charge that Bethlehem "has violated the general injunction against race discrimination" by the reduction in force, or "riffling," of these black supervisors in 1977 (Memorandum of Black Supervisors, p. 4). They further claim that, because of their non-bargaining unit employment status, this issue is, or was, outside the authority of the ADIC. Having invoked the authority of the ADIC, absent any showing of coercion or corruption, it is now unreasonable to permit these individuals an additional *de novo* forum simply because they believe they have received an unsatisfactory result. *But see, EEOC v. Safeway Stores, Inc.*, 714 F.2d 567, 576 (5th Cir. 1983) (conciliation agreement between EEOC and the company may not survive objection by non-party union that agreement would improperly supercede collective bargaining agreement).

It must be remembered that, although the EEOC specifically represented bargaining unit employees, that representation "acts also to vindicate the public interest in preventing employment discrimination." *General Telephone, supra* 446 U.S. at 326, 100 S.Ct. at 1704. The black supervisors now argue that their general claims of racial discrimination could not have been taken into account under the aegis of Decree direction (*see, generally*, Memorandum of Black Supervisors at p. 4). Certainly, the entire focus of these multi-faceted lawsuits has been to expunge discriminatory practices from the steel industry.

## II.

Keeping in mind this limited review, each of the 18 requests deserves attention. No transcript of the ADIC proceedings was kept. Counsel for the EEOC has provided this court with a synopsis of each employee's grievance proceeding. That synopsis includes ADIC letters, ADIC minutes, documents submitted by the complainants, an ADIC summary sheet, and supporting information. In addition, any claimants appearing before this court on December 10, 1982, were permitted to submit further documentation of their allegations. This information, in conjunction with hearing testimony, has provided the court with an adequate record for review of the ADIC claims.

■ Turning first to Mr. Pickering's claim, for he is separately represented by counsel, this court finds no basis for interference in the ADIC decision. Mr. Pickering alleges procedural misconduct based on a lack of a unanimous decision because, he claims, the Union took no part because his was not in a bargaining unit position. Mr. Pickering insists that this irregularity, coupled with the absence of a formal record, constitutes a sufficient basis for reaching a conclusion different from the ADIC. This court has already found the record sufficient. Furthermore, since Mr. Pickering's interests were represented by the EEOC, and because the Union understandably had no interest in a non-bargaining unit employment problem, he has failed to state adequate grounds for review.

■ Mr. Conner also filed a request for review. His hearing was held February 17, 1983. He claims that because his employment evaluations had been lost by Bethlehem, any decision made by the ADIC lacked sufficient evidence to support a finding. The ADIC concluded that although Mr. Conner had been evaluated for a supervisory position, only three positions had been filled during the period in question, and one of those had been filled by a black employee. For that reason, the ADIC properly concluded that there had been no violation of the Amended Decree.

■ The remaining group of 16 supervisors collectively argue that the decisions of the ADIC are not supported by substantial evidence. Each claims that additional statistics could substantiate a claim of discrimination. They fault the EEOC summaries

and ADIC proceedings, because they insist that the data to support the ADIC conclusions came solely from the Company. For example, Messrs. Lockett, Lamar, and Royster argue that not only was the information limited, it was also incorrect. However, each had the opportunity to submit information before the ADIC; hence, any incompleteness in the record must be attributed at least in part to the claimants themselves. More importantly, the EEOC now assures the court that they had access to more than just Company reports. They also looked for any evidence of discrimination in the individual department reviews.

Finally, the claimants are reminded that the ADIC viewed each individual claim on a case-by-case basis. Any extended claims based upon either additional information or upon a theory of a general scheme or plan resulting in discriminatory import could be addressed in a suit initiated by the individual employees under Title VII. *See General Telephone Co. v. EEOC, supra* at 326, 100 S.Ct. at 1704. As noted earlier, three such suits were initiated by three of these employee claimants. *Williams v. Bethlehem Steel, Inc.,* No. 82–423; *Washington v. Bethlehem Steel, Inc.,* No. 82–424; *Verbanic v. Bethlehem Steel,* No. 82–402. All are before this court. Mr. Verbanic's suit and his instant claim differ from the others in this group. He claims reverse discrimination as a result of his efforts to assist minority employees.

In summary, each and every one of these requests to interfere with the ADIC decision is denied in all respects.

### III.

Appeals from the decisions of the Special Master deserve different treatments. The backlog of CDIC and ADIC matters caused the parties to agree to the appointment of a Special Master to handle all Amended Decree matters not otherwise resolved as of October 25, 1979. This court's order of May 21, 1979, included the parties' stipulation that the "Master's findings of fact shall be final and as to other matters, his report on any complaint or grievance shall be binding," unless an objection is made within 20 days after the report is filed. *EEOC, supra,* at 5. Furthermore, the Special Master had absolute authority "to establish procedures for the handling of all matters referred to him." *Id.*

This court is restricted to a very limited review of these requests, primarily because reference to a Special Master was consensual.

> When parties consent and maintain reservation, the district court may only review when there is a question of manifest error in the consideration given to the evidence, or in the application of the law.

*Kimberly v. Arms,* 129 U.S. 512, 524, 9 S.Ct. 355, 359, 32 L.Ed. 764 (1888). Furthermore,

> To disregard the findings and treat the report as a mere presentation of the testimony is to defeat, as we conceive, the purpose of the reference and disregard the express stipulation of the parties.

*Id.* at 525, 9 S.Ct. at 359.

Although dated, this position remains unchanged. Fed.R.Civ.P. 53(e)(2). For example, the United States Court of Appeals for the First Circuit recognizes that consent operates as a waiver to trial by a judge or jury. *DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d 499, 505–06 (1st Cir.), *cert. denied,* 389 U.S. 1007, 88 S.Ct. 565, 19 L.Ed.2d 603 (1975). Hence, this court is bound to accept the Special Master's findings "unless clearly erroneous." Fed.R.Civ.P. 53(e)(2). Of course, the burden of demonstrating such error is upon those individuals who seek review. None of those seeking review of the Special Master decisions has met that burden.

### IV.

Of the 12 individuals who had originally requested review of the Special Master's decisions, only 9 of them gave notice, and then only 8 appeared in court on December 12, 1982. Mr. Tanyi and Mr. Worthy neither gave notice nor appeared. Mr.

Braxton neglected to give notice, but he did appear. Additionally, Mr. Byrd and Mr. Morgan did give notice, but then did not appear.

Most of these requests dispute the back pay calculations made by the Special Master. One of the requests was made by Mr. Curtis Minniefield. He attempts to upset a decision by the Special Master in a case involving a fellow employee by the name of Price. Minniefield claims he suffered an adverse effect as a result of the relief awarded Price. Since none of the proceedings before the Special Master in the Price grievance involved Mr. Minniefield, he may not seek review of that decision. Furthermore, Mr. Minniefield's only basis for dispute is a claim that the Union never presented all of the evidence in the Price case. At the hearing, the Union's attorney assured the court that an investigation was made. Certainly, Mr. Minniefield had other more direct recourse, either by his own union grievance, or by an independent discrimination claim. Finally, this court notes that even if Mr. Minniefield could address the Special Master's findings, he has failed to show that his own layoff was the direct result of Mr. Price's move to Mr. Minniefield's department. Conjecture, no matter how well intentioned, shall not provide the basis for factual evidence in this case.

Mr. Paul Sibiga has addressed several claims. His request for compensation as a result of post-hearing layoffs is not properly before this court. He may only address clearly erroneous decisions of the Special Master. He and Mr. Robert North request review of decisions that concern the application of the seniority practices of the Air Conditioning Department (Dept. 490). Although Mr. Sibiga claims that the Special Master never addressed Complaint No. 1C–191, Order No. 35 makes specific reference to 1C–191. Additionally, Mr. Sibiga complains that the Company has not met its obligations with respect to payment information referred to in Order No. 35. Even if that were true, it is not properly the subject of any review of the Special Master's order. Upset of that order is limited to a finding of a clearly erroneous decision

on the part of the fact finder. A contempt remedy may be available to Mr. Sibiga, but not this requested review. Finally, Mr. Sibiga claims that his 1973 request for a craft test grievance should have been treated just as his 1976 craft test grievance. Although Mr. Sibiga insists that the Special Master had "no justification" for reaching different results for each of those requests, Order No. 35 points out that paragraph 6 of the seniority practices agreement provides for a craft-rating mechanism which operates prospectively. For that reason, Mr. Sibiga cannot successfully challenge the decision as groundless.

Mr. North claims that the Special Master failed to consider his seniority for purposes of his promotion. However, the decision of the Special Master was limited to a threshold finding of an ADIC violation. Since the craft testing procedures were within acceptable ADIC guidelines, and since Mr. North now gives no reason why any additional evidence was omitted from the Special Master's review, this court may not interfere with the decision of the Special Master. It is evident that the Special Master was obligated to use both the seniority factor as well as the ADIC guidelines, and Mr. North has failed to demonstrate that serious error was made with respect to the omission of either guideline.

Lanzier McRae claims that he was denied an opportunity to participate in the proceedings before the Special Master. He further asserts that his active participation would have permitted an explanation for his transfers from the Electrical Repair Shop to the Bar Mill. He now claims that he made those changes to avoid discriminatory treatment, but as a result of his transfers, he was denied the training that would have permitted him to advance in the Company. Finally, he claims that any inquiry regarding his transfers should have included 1972 through 1975, and not just November 5, 1975, forward.

It must first be noted that Mr. McRae fails to present any reason for his alleged failure to present a complete case before

the Special Master. Furthermore, the opinion of the Special Master describes in detail the misunderstanding surrounding Mr. McRae's request for a return to the Bar Mill. It is therefore impossible to imagine, without benefit of substantiation by the claimant, that Mr. McRae could have further improved the very careful rendering of the transfer history in this case.

It must be noted that Mr. McRae's original ADIC complaint alleged that transfer back had been the result of misinformation and not the result (as he now claims) of discrimination.

Following Mr. McRae's second request to transfer on November 5, 1975, the Special Master found that the Armature Winder apprenticeship position should have been offered to the claimant on July 17, 1975. The back pay award was based on that finding. The Special Master correctly found that Mr. McRae was entitled to no more than the relief available pursuant to the Amended Decree. The claimant has failed to establish any error in this determination. For this reason, the opinion of the Special Master is affirmed.

Mr. Willie Thomas and three others complain that the wrong formula was used by the Special Master to compute their back pay awards. Only Mr. Thomas appeared at the December hearing. Mr. Richard Ugelow's affidavit submitted in support of the calculation develops a sensible explanation of the formula. Mr. Ugelow is an attorney with the Department of Justice, Civil Rights Division. Since 1976, he has been involved in the implementation of Consent Decree I at the Lackawanna Plant.

Mr. Thomas has failed to demonstrate that the calculation is in any way clearly erroneous. Any remaining complaint Mr. Thomas has with respect to nonpayment by the Company of monies due and owing pursuant to the order of the Special Master may not be the subject of this court's present review.

Mr. Sherman Price claims that he was held back from transfer to a higher paying job in Department 668 and that he was not permitted to "bump" incumbent crane operators. The ADIC found in Mr. Price's favor on his first claim and awarded back pay. The only dispute now is whether the Special Master properly affirmed the ADIC back pay award. The ADIC awarded only for the period August 4, 1974, to March 24, 1975. At the hearings before the Special Master, the Union sought backpay for the entire period from November 9, 1971, until March 24, 1975. The Union further claimed that Mr. Price should have been compared to a different group of employees in order to determine the make-whole remedy for part of the period in question. Absent any new evidence to contradict the ADIC findings, the Special Master properly affirmed the ADIC decision. Mr. Price also claims an improper calculation of his pension and supplemental insurance plan benefits.

Mr. Price has failed to substantiate any error on the part of the Special Master. If additional evidence might have caused a different result in the decision of the Special Master, certainly that possibility alone is an improper basis for Mr. Price's present request for review.

Mr. James Robinson not only claims that the Special Master's decision was erroneous, but he also seeks original review of additional claims and evidence never presented to the Special Master. Of course, this court may address none of those additional claims. With respect to the review of Mr. Robinson's Order No. 24, this court finds no grounds for a finding that clear error was made by the Special Master. At the hearing, Mr. Robinson stressed that he was improperly denied a transfer, yet there is no evidence that he had ever properly requested a transfer.

Mr. Clifford Braxton failed to preserve his request for review by this court by not sending his notice of intention to appear. Even if he had met this requisite, his claim refers to a pre-Decree matter. Furthermore, the Special Master specifically found that he was without jurisdiction to hear Mr. Braxton's complaint. Mr. Braxton has failed to demonstrate that his grievance was not a collective bargaining matter.

For all these reasons, this court declines to interfere with Order No. 19.

Although the other individuals who had originally requested review of the Special Master's decisions did not preserve their right to review because they failed to give notice and appear at the December, 1982, hearing, this court notes in passing that none of those requests establishes a basis for a change of decision.[1]

For all of the above-stated reasons, the requests to interfere with ADIC and Special Master decisions are denied in all respects.

The EEOC is instructed to review the shut-down procedures at the Lackawanna plant and make any recommendations necessary to insure the proper conclusions of all Amended Decree matters. The government shall file a report on these matters on or before May 1, 1984.

So ordered.

---

1. This court notes that individuals still wishing to file Title VII suits might not be time-barred according to the recent Supreme Court language in *Crown, Cork & Seal Co., Inc., v. Parker,* —— U.S. ——, 103 S.Ct. 1269, 75 L.Ed.2d 492 (1983).