EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

LOCAL 14 INTERNATIONAL UNION OF OPERATING ENGINEERS et al., Defendants.

No. 72 Civ. 2498 (CHT).

United States District Court, S. D. New York.

May 6, 1976.

**1158**

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, for plaintiff; Michael S. Devorkin, Steven J. Glassman, Asst. U. S. Attys., New York City, of counsel.

Doran, Colleran, O'Hara, Pollio & Dunne, P. C., Garden City, N. Y., for Local 14–14B;

Robert A. Kennedy, New York City, Alan J. Reardon, Garden City, N. Y., of counsel.

Corcoran & Brady, New York City, for Local 15; William J. Corcoran, Robert D. Brady, New York City, of counsel.

Shea, Gould, Climenko & Kramer, New York City, for General Contractors Assn.; James J. A. Gallagher, Peter D. Stergios, New York City, of counsel.

TENNEY, District Judge.

This is an action presently brought by the Equal Employment Opportunity Commission ("EEOC") in a complaint signed by the Attorney General of the United States in May 1972 under the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., pursuant to authority granted to the Attorney General in that Act, Act of 1964, 42 U.S.C. § 2000e–6(a),[1] and filed herein on June 13, 1972. This Court has jurisdiction pursuant to 28 U.S.C. § 1345 and 42 U.S.C. § 2000e–6(b).

The defendants are local unions or divisions of such unions engaged principally in the operation and maintenance of construction equipment, and contractors' associations with whom such unions or divisions thereof have collective bargaining agreements all, with minor exceptions, within the Southern District of New York. The action was tried to the Court solely as to liability. Accordingly, with the exception of a brief appearance by defendant General Contractors Association of New York, no defendant contractors' association was represented at the trial of the limited issue of liability.

### THE COMPLAINT

The complaint alleges that Locals 14 and 15 of the International Union of Operating Engineers (hereinafter "Locals 14 and 15" or "the Union") including the former's affiliate Local 14B and the latter's subdivisions 15A, B, C and D (hereinafter Locals 14B, 15A, 15B, 15C and 15D) are engaged in a pattern and practice of resistance to full enjoyment of nonwhite and Spanish sur-

---

1. Pursuant to the pre-trial order dated September 19, 1974 filed herein, the Equal Employment Opportunity Commission ("EEOC") was substituted for the United States of America as party plaintiff in accordance with the 1972 amendments to Title VII of the Civil Rights Act of 1964 authorizing such action by EEOC. 42 U.S.C. § 2000e–6(c).

named workers of rights secured to them by 42 U.S.C. § 2000e–2(c) and § 2000e–2(d). This pattern or practice of resistance is alleged to include, but is not limited to, the following specific acts and practices:

"(a) Failing and refusing to admit non-white and Spanish surnamed workers into the defendant unions as journeymen members on the same basis as whites are admitted;

(b) Failing and refusing to refer non-white and Spanish surnamed workers for employment within their respective jurisdictions on the same basis as whites are referred by applying standards for referral which have the purpose and effect of insuring referral priority to their members, a substantial number of whom are white;

(c) Failing and refusing to permit contractors, with whom the defendant unions have collective bargaining agreements, to recruit black and Spanish surnamed workers on the same basis as whites are recruited;

(d) Failing and refusing to permit contractors with whom the defendant unions have collective bargaining agreements to fulfill the affirmative action obligations imposed upon these contractors by Executive Order 11246 by refusing to refer for employment non-white and Spanish surnamed workers whom such contractors wish to employ;

(e) Failing and refusing to take reasonable steps to make known to non-white and Spanish surnamed workers the opportunities for employment in the trades under their jurisdictions, or otherwise to take affirmative action to overcome the effects of past racially discriminatory policies and practices; and

(f) Failing and refusing to file accurate reports with the Equal Employment Opportunity Commission;

(g) Failing and refusing to take reasonable steps to overcome the effects of past racially discriminatory policies and practices." (Complaint ¶ 13) [2]

It is charged that Local 14 has approximately 1,600 members and that "there are few non-white and Spanish surnamed persons in [that membership]." (Complaint ¶ 3). It is further charged that Local 15 and its subdivisions have approximately 5,650 members, the composition of which is as follows: Local 15 has 2,002 members of whom 267 are nonwhite or Spanish surnamed; Local 15A has 670 members, of whom 87 are nonwhite or Spanish surnamed; Local 15B has 363 members, of whom 47 are nonwhite or Spanish surnamed; Local 15C has 1,340 members, of whom 212 are nonwhite or Spanish surnamed; and Local 15D has 1,275 members, of whom 155 are nonwhite or Spanish surnamed. (Complaint ¶ 5).

It is charged that Local 14 has collective bargaining agreements with defendants Building Contractors' and Mason Builders' Association, the Cement League, the Stone Setting Contractors' Association, the Allied Building Metal Industries, the Rigging Contractors Association, and the Contracting Plasterers' Association; that Local 15 has collective bargaining agreements with defendants The Iron League of New York City, Inc., the Construction Equipment Rental Association, the General Contractors Association of New York City,[3] the Building Contractors' and Mason Builders' Association, the Cement League, the Stone Setting Contractors' Association, the Allied Building Metal Industries, the Rigging Contractors' Association, the Contracting Plasterers' Association, and the Equipment Shop Employers, and that under the provisions of these collective bargaining agreements and the practices developed thereunder, Locals 14 and 15 control employment opportunities

**2.** The issue in subparagraph (f) of ¶ 13 of the complaint relating to the filing of accurate reports with the EEOC has been abandoned. (Pre-Trial Order ¶ 1).

**3.** The General Contractors Association of New York City, Inc. ("GCA") contends that it has no

collective bargaining agreements with Locals 14 or 15 and is not a proper party. It has been stipulated that the complaint does not assert any claim for liability against GCA. (Pre-Trial Order, at 11).

in the operating engineers' trade within the City of New York and in the surveyors' trade within the City of New York and the counties of Westchester, Putnam, Dutchess, Nassau and Suffolk within the State of New York. (Complaint ¶¶ 4, 9 and 11). The defendants with whom Locals 14 and 15 have collective bargaining agreements are hereinafter referred to as the "contractors' associations".

The complaint seeks injunctive relief against the alleged discriminatory practices.

## FINDINGS OF FACT

### Background of Locals 14 and 15

(1) Locals 14 and 15 are chartered locals of the International Union of Operating Engineers ("IUOE") and are governed by the same International Constitution. (Pre-Trial Order at 7, ¶ 6(a); at 9, ¶ (a) (hereinafter "PTO"); Tr. 27, 48). The trade jurisdiction of Local 14 includes both building work and heavy construction work. Heavy construction work includes digging foundations for buildings, driving piles on those foundations, and building docks, bridges, sewers, tunnels and roads. The building work includes most hoisting equipment although hoisting work occurs in other areas, e. g., tunnel and bridge work.

(2) Local 14B is not, strictly speaking, a "branch" or "division" of Local 14 since it was issued its own charter from the IUOE as an organizing local on December 31, 1938 (PTO at 7, ¶ 6(a)). The trade jurisdiction of Local 14B includes the operation of hoisting equipment in private scrapyards and brickyards, some well-digging work, and steve-

doring operations on the waterfront of New York. (Tr. 388, 484–85).

(3) Local 15's trade or work jurisdiction primarily consists of the operation and maintenance of equipment for building and heavy construction sites, and related work, including welding and surveying. (Tr. 20–22). It is one union with five branches which operate under the direction and control of the parent Local Union, and are governed by a single set of by-laws and officers.[4] The membership of Locals 15 and 15A includes operating engineers, maintenance engineers, and welders on heavy construction and building sites, as well as relatively unskilled oilers, helpers, general maintenance personnel or skilled mechanics who do not operate heavy equipment machinery. Local 15B covers persons doing maintenance work at the Port Authority of New York and various racetracks in New York State. Local 15C covers maintenance engineers for construction equipment who work in indoor repair shops run either by equipment dealers or construction contractors, and who range from unskilled helpers to grade A and B engineers. Local 15D covers field engineers engaged in surveying work on heavy construction or building sites. The surveyor categories include the relatively unskilled rod man, the transit man and the chief of party. (Tr. 22–24, 345–46, 356–57; Pl.Ex. 7 (hereinafter "PX")).

(4) The geographic jurisdiction of Locals 14 and 15 is New York City,[5] (herein after sometimes referred to as "the City") and they are the only operating engineer locals in the country which are chartered with the same geographic jurisdiction.[6]

---

**4.** The International Constitution permits branch subdivisions to be chartered to operate "under the direction and control of the parent Local Union". (PX 5D, Art. XIV, at 40–41, 44). Hereinafter mention of Local 15 or the Union shall refer to all branches; any reference to a branch of the Local 15 will specifically use the term "branch".

**5.** The unions are considered to be New York City Locals by their principal officers, and they were so chartered. (Tr. 25). The International Constitution requires that the branches' territorial jurisdiction not exceed that of the parent Local. (PX 5D, Art. XIV, at 40–41). Although the jurisdiction of Branch 15C appears to in-

clude Westchester, Putnam, Nassau, Suffolk and the southern part of Dutchess Counties, and members of 15C work in unspecified areas outside of New York. (PX 99; Tr. 372–74). For all practical purposes, however, the membership of the two Locals works almost exclusively within New York City.

**6.** As a general proposition the two Locals do "the same work". (Tr. 25, 47). In fact, elsewhere in the country, it would appear that many of the members of Local 15 would be Junior and Assistant Engineers within a subdivision of Local 14. Those terms are used in all of the contracts with employers (see, e. g., PX

(5) Despite the contentions of the EEOC, Local 14 has never recognized Local 15 as its apprentice Local or had apprentice jurisdiction of the latter,[7] although the latter has apprentice jurisdiction and furnishes a substantial number of new members for Local 14, i. e., 50%. (Tr. 425, 516–17; PX 13A, at 153, 738; PTO Attachment B, ¶ 29). There is no provision for the "automatic" transfer of Local 15 members into Local 14, and a member of Local 15 seeking to transfer from Local 15 to Local 14 must go through the same admission procedures as any applicant seeking admission.

(6) Local 15 is an amalgamation of Locals 130A, 125A and 184A which covered apprentices, junior engineers (helpers and oilers) and some operating engineers on all building and heavy construction equipment in New York City, while Local 14 is an amalgamation of the parent locals 130, 125, 184 and 403 which covered most of the operators of such equipment. (Tr. 43–47, 51–53, 382, 508–10, and 516). To become an operator in one of Local 14's predecessors, one had to serve first as an apprentice in one of Local 15's predecessors. However, when the amalgamation took place in 1937, Local 15 did not want to be primarily an apprentice union, and therefore it was given jurisdiction over some equipment operators also. As a result of these amalgamations, the IUOE, in issuing the charters in 1937, assigned Local 14 responsibility for large hoisting equipment, certain small hoisting and construction equipment operated above the ground level, and certain large construction equipment used at the ground level or underground. Local 15 was assigned responsibility for most heavy construction equipment, including the smaller versions of some Local 14 machinery and smaller hoisting equipment.

(7) The type of equipment utilized by Local 14 men includes hoisting equipment such as cranes and derricks, as well as pile drivers, drag lines, power shovels, backhoes, graders, rollers, mixers, compressors, well drilling inclines and welding machines. (PX 40E, at 15–18).

(8) The type of equipment utilized by Local 15 men includes cherrypickers, loaders, scrapers, graders, bulldozers, tractors, power shovels, fork lifts, and mixers. (PX 40E, at 18–22).

(9) Although some of the equipment utilized by Local 15 is comparable to equipment utilized by Local 14, the equipment utilized by Local 14 is generally larger, or utilized in a different area.[8] Local 15 does not have jurisdiction to operate cranes. Its members do operate "cherrypickers", which require a New York City license, but not for the same operations as the cranes under Local 14's jurisdiction.

(10) The City of New York requires the operators of certain Local 14 and Local 15 equipment to be licensed by the City. Most of the welders for Local 15 must be certified (Tr. 20–21, 330) and members of Local 15 who operate cherrypickers must hold Class "C" New York City licenses. Operators of large hoist machinery must have a New York City Type "A" or "B" hoist machine operators' license. The actual requirements are specified in Local Law No. 73. (PX 112, at 2).

---

40E). The predecessors of these Locals also did some of the same work as each other, but at different locations on a building site. (Tr. 44–46).

7. Local 14's jurisdiction, as mandated by its charter as issued by the IUOE, does not include an apprenticeship or recruitment program, Local 14 being strictly a journeyman local composed of licensed engineers. Local 15 on the other hand has a charter which permits it to maintain training or apprentice programs.

8. Both Locals 14 and 15 utilized backhoes, with Local 14's backhoes being larger and requiring two operators, one a Local 14 man and one a Local 15 man. (Tr. 397–400). Locals 14 and 15 both operate rollers, the only difference being in size. (Tr. 400–01). Local 14 also operates a larger version of a Local 15 grader. Local 14 operates cherrypickers (a small hoist machine) and front-end loaders above the ground level on a building, while Local 15 operates the same equipment at the ground level. Other similar types of machines operated by both Locals include pavers, locomotives, road finishing machines, concrete mixers, tugger hoists and compressors. (PX 40E, at 15–22).

The first requirement for admission to Local 14 is, and has been, that all applicants be licensed engineers in accord with the laws of the City of New York. (PX 6A, at 5; PX 6B, at 7; PX 6C, at 9; PX 6D, at 9; PX 63; PX 112; Tr. 427, 437, 512, 623, 1775, 1812, 1841, 1889 and 3840).[9] Although certain equipment operated by Local 14 is specifically exempt from the licensing requirement, i. e., front-end loaders, scrapers, backhoes, power shovels, gradalls, tunnel mucking machines, back-filling machines, compressors, wellpoint pumps, concrete mixing machines, welding machines, spreaders, locomotives, rollers and drag lines (Tr. 3832–33), on any particular project 75 to 95 percent of the equipment under Local 14's designated craft jurisdiction must, when operated within the City of New York, be under the control of an operator licensed by the City. (Tr. 500, 585–86, 1825–26 and 3838).[10] Moreover, although Local 14 operates equipment not requiring a license, its collective bargaining agreements give the employer the right to shift a man from one piece of equipment to another irrespective of whether such piece of equipment requires a license to operate.

(11) Examinations for the "Hoisting Machine Operator" are administered semi-annually by the Department of Personnel of the City of New York. (Tr. 431, 1941, 1954). The examination consists of two parts, a written examination of seventy questions and a practical operational examination on a crane, compressor, bulldozer or front-end loader. (Tr. 1941, 1953–55). To be eligible to file an application to take the examination, an applicant must be at least 21 years of age, able to read and write the English language, and have at least two years experience as an oiler or as an assistant to an operator on cranes, derricks or

cable-ways. (Defs. Ex. B (hereinafter "DX")).

(12) In addition to the license requirement for admission to membership in Local 14, an applicant ordinarily will not be granted admission unless he has 200 days of work experience on heavy equipment and satisfactory performance on two or more pieces of such heavy equipment, e. g., power shovels, draglines, backhoes, clamshells, pile-drivers, cranes and double drum derricks (PX 6D), although he may be referred out to work as a "permit" man. (Tr. 449–52, 459, 557). Also, in order to become a member of Local 14 an applicant who has no prior affiliation with any operating engineers' local must have two members of Local 14 sponsor his admission. (Tr. 457, 498; PX 6D).

(13) Local 15 expressly "reserves the right to prescribe its own rules with respect to acquisition and retention of membership within the framework of the governing constitution of the International Union" (PX 7, Art. IV, Sec. 1) and any candidate "must be a qualified and competent person and otherwise fulfill the requirements of the Constitution of the International Union of Operating Engineers." (Id., Art. IV, Sec. 2).

(14) Locals 14 and 15 are the exclusive bargaining agents for 95% of the persons operating and maintaining construction equipment and doing surveying work within their respective trade and geographic jurisdictions. The Locals have collective bargaining agreements with a large number of employers and employers' associations (PX 40–60) which require the employers to recognize the Union as a source of qualified employees (e. g., PX 50C, at 3; PX 46, at 3). Although there are instances where employers may initially hire non-union help directly, both unions effectively

---

**9.** Although the licenses issued by the City have been designated by different titles over the years, i. e., "Portable Steam", "A.M.P.E.S.", and most recently "Hoisting Machine Operator", Local 14 has always had such a license as a basic requisite for admission. (Tr. 512, 3841–42).

**10.** Work in scrapyards performed by Branch 14B men and work performed on floating cranes do not require a license. (PX 112, at 9–10). In addition, no license is required for any work performed using any Local 14 equipment on tunnel work, and work for the Port Authority, Triboro Bridge and Tunnel Authority, Urban Development Corp., and State Dormitory Authority.

control the work opportunities within their jurisdictions. Until the forties, Locals 14 and 15 had closed shop contracts with employers which required these employers to hire only union members. (Tr. 59).

(15) Locals 14 and 15 have the following officers elected by the membership, which officers are primarily responsible for the affairs of the unions including the negotiation of collective bargaining agreements: President, Business Manager, Vice President, Secretary and Treasurer. (PX 6, at 2; PX 7, at 5).

(16) The Business Manager is the principal officer of the Local (PX 6C, at 4; PX 7, at 6–11; Tr. 18). The Local 15 Business Manager appoints the business agents or representatives for each of Local 15's branches. (PX 7, at 7). Local 14's Business Manager also appoints Local 14's business agents (PX 5D, Art. XXIII, subdiv. 1, at 82). Local 14 and some branches of Local 15 have divided responsibilities among their business agents on a geographic basis. These business agents in the course of their duties are primarily responsible for conducting the day-to-day affairs of their branches.

(17) Local 14 has never had a black or Spanish surnamed (hereinafter "minority") person serve as President, Business Manager, Vice President, Treasurer, business agent, or a member of any executive board, or committee to examine the qualifications of applicants for membership. (PX 39, at 3–13). Local 15 never had a minority member serve as such an officer until 1972 when a minority member was made a trustee (PX 38, at 8) and, later in 1975, was appointed as a member of its Executive Board. A second minority member was appointed as an auditor in May 1973, apparently following the death of another minority member serving as auditor (PX 38, at 10), and shortly thereafter became a trustee (Tr. 3247).

(18) When first chartered in 1937, Local 15's membership was almost all white (Tr. 57–59). As of September 1, 1974, Local 15 had 6,362 members of whom 415 (6.5%) were minority persons. These were divided

among the five branches as follows (PX 98 and 99):

| | Total Members | Minority Members | % of Total | |
|---|---|---|---|---|
| 15 | 2,411 | 134 | 5.6% | } 7.5% |
| 15A | 702 | 99 | 14.1% | } |
| 15B | 326 | 47 | 14.4% | |
| 15C | 1,491 | 59 | 4.0% | |
| 15D | 1,332 | 76 | 5.7% | |

Of these 415 minority members, 124 (or 31.1% of the total) were admitted after this lawsuit was filed in July 1972 as follows (PX 99):

| | | |
|---|---|---|
| 15 | — | 26 |
| 15A | — | 69 |
| 15B | — | 4 |
| 15C | — | 17 |
| 15D | — | 8 |

Of these 415 minority members, 318 (or 76.6% of the total) have been admitted since July 2, 1965, the effective date of the Civil Rights Act of 1964, as follows (PX 99):

| | | |
|---|---|---|
| 15 | — | 91 |
| 15A | — | 99 |
| 15B | — | 39 |
| 15C | — | 43 |
| 15D | — | 46 |

Of the 318 minority members admitted since July 2, 1965, 124 were admitted since this suit was instituted in 1972 and 194 prior thereto.

The approximate membership and minority membership of Local 15 from January 1, 1960 to November 1974, has been as follows:

| | Total | Minority | % |
|---|---|---|---|
| 1/1/60 | 3,094 | 30 | 1% |
| 1/1/64 | 4,584 | 78 | 1.7% |
| 1/1/65 | 4,680 | 93 | 2% |
| 1/1/66 | 4,772 | 99 | 2.1% |
| 1/1/67 | 4,740 | 112 | 2.4% |
| 1/1/68 | 4,984 | 135 | 2.7% |
| 1/1/69 | 5,153 | 171 | 3.3% |
| 1/1/70 | 5,252 | 202 | 3.8% |
| 1/1/71 | 5,494 | 240 | 4.4% |
| 1/1/72 | 5,661 | 273 | 5.7% |
| 1/1/73 | — | 331 | — |
| 11/1/74 | 6,362 | 415 | 6.5% |

(19) As of September 1, 1974, Local 14 had 1,555 members, of whom 44 (2.8%) are minorities; 1,398 are in Local 14, of whom

24 (1.7%) are minorities; and 157 are in Local 14B, of whom 20 (13.3%) are minorities. Two of these 44 minority members are Spanish surnamed.

(20) Members of Locals 14 and 15 generally have no more than a high school education and neither union requires applicants to have a high school education (PX 5D, at 29–30; PX 6C, at 8–10; PX 7, at 14–15). The available labor pool for operating engineers in the New York City area today, as well as in the past, consists primarily of males living in the Union's jurisdiction who have a high school education or less.

(21) The black percentage of the New York City male labor force is 18.18% and the Spanish surnamed percentage of that labor force is 12.67%. Therefore, for the purposes of this suit the minority percentage of the New York City male labor force is 30.85%. (PX 1A, Table A(2), at 3).

(22) The black percentage of the New York City male labor force 16 years of age and over who have a high school education or less is 20.76%. The Spanish percentage of such labor force 16 years of age and over who have a high school education or less is 15.63%. Therefore, for the purposes of this suit, the minority percentage of such labor force 16 years of age and over who have a high school education or less is 36.39%. (PX 1A, Table A(2), at 2).

(23) The U.S. Army Corps of Engineers trains some 3,300 operating engineers annually, about 20% of whom are black. (Tr. 1742–43, 1766).

(24) The IUOE has since 1965 sponsored a Job Corps training program for operating engineers lasting from 18 months to 2 years, which program is financed by the Federal Government and conducted by members of the IUOE. This program appears to relate to equipment under the jurisdiction of Local 15 rather than that under the jurisdiction of Local 14.

## Local 15

### Training for Local 15 Operating Engineers

(25) Historically New York City operating engineers in Local 15 have learned their trade from on-the-job experience and in the past have relied, to an appreciable extent, upon friends and relatives for their training or for the opportunity for training, whether as an operator, maintenance engineer, oiler, mechanic or surveyor.

(26) In December 1970, Local 15 began to operate a small training facility near Kennedy Airport. Initially the school had three types of equipment: backhoes, front-end loaders and bulldozers. Gradually additional types of these machines and a cherrypicker were added. The school operates on Saturday only, since many of the students are employed during the week. Union members serve as instructors, the school being financed by the Training Fund of Local 15. (Tr. 3566, 3570–79). Since the school's inception, minorities seeking work from or membership in Local 15 are referred by business agents to the school, where, if they claim to be experienced, they are tested on three types of equipment or, if inexperienced, are admitted to the school or placed on a waiting list. However, all applicants for membership have not been sent to the school for testing or training but are permitted to work and be tested by their employers. Very few of the white applicants are required to take and pass the tests at the school, as borne out by the school's admission figures. From July 1972, when this lawsuit was filed, to November 1, 1974, Local 15 admitted 124 minority members, while from January 1, 1972 to November 1, 1974, the total membership increased by approximately 700 so that of the latter approximately 575 must have been white. However, during this period only 20 whites, as compared to 33 nonwhites, came in through the school. (DX G).

(27) While the majority of applicants for membership in Local 15 who are sent to the Local's school are minorities, there is no discrimination as between whites and minorities attending the school; in fact, three of the six instructors are nonwhite. However, since the school training requirement is imposed primarily upon minorities, it adversely affects their employment and membership opportunities. The school has

enough room for about 50–55 at one time and in September 1974 had a waiting list of about 200. (Tr. 158–59, 319). It graduated 17 men in 1972, 30 in 1973, and 6 in the early part of 1974 (DX G): approximately 20 were Union men taking retraining and approximately 30 were nonunion, with a little over one-half of the nonunion men being minorities, so that the school has the ability to train only about 15 minorities per year for admission to the Union. (Tr. 3191).

(28) Other training programs produce large numbers and percentages of minority graduates, yet Local 15 refuses to accept the experience and qualifications of these minority graduates. The Job Corps training program for operating engineers, sponsored by the IUOE, not only consists of classroom work but also of practical experience operating bulldozers, front-end loaders, backhoes and graders, as well as surveying work. It would appear to be better than Local 15's training program. Likewise, the training program of the United States Army Corps of Engineers, and the subsequent experience received by enlisted men operating equipment similar to that operated by Local 15 would appear to be more effective than Local 15's training program. Since a substantial number of the graduates of the IUOE and Army programs for operating engineers are minority persons who return to New York City, Local 15's refusal to accept their status and training, where less experienced and less or equally qualified white persons without such training are referred, and in fact even admitted to the Union, discriminates against such minorities. The actual on-the-job training traditionally available to whites is superior to the Union's school because (a) the skills can be learned quickly and properly on the job; (b) there are actual working conditions imposed on the men as they learn; and (c) the men are compensated by an employer for their training time.

*Local 15 Job Referrals*

(29) The combination of closed-shop contracts prior to 1948 requiring that only Union members be employed, and the virtually all white composition of Local 15 had the effect in the past of excluding minority persons from this industry.[11]

(30) The job referral practices of Local 15 before and after the effective date of the Civil Rights Act of 1964 have had the effect of discriminating against minorities and maintaining the effects of past discrimination. Employers usually seek employees they need directly from the Union, or call directly a Union employee they have employed in the past. Minorities represent a far greater percentage of nonunion persons available for and seeking work.

(31) Local 15 runs a hiring hall, known as the "hall" or the "day room". Employers and employees rely heavily on the Union for job referrals, 30% of the members of Local 15 using the "day room" with the remaining 70% steadily employed. Work assignments are not customarily made on a first come, first served basis, but rather are made in the order in which an individual has signed the list. However, a new list is made up each week, so that someone who has been waiting for a job for four weeks may go to the bottom of the list. Also, a man does not necessarily sign the list in the order that he entered the "hall". In signing the list he sets down his name and the equipment he can operate. He also may indicate his Union affiliation, if any, or whether he is a "permit man". In making the work assignment, the decision of the business agent is based upon subjective rather than objective criteria. Although there is no credible evidence of deliberate discrimination in the referral procedures over recent years, there is not sufficient information made available to nonunion applicants, particularly minorities. Unless a man writes down the length of time he had been unemployed, this fact would play no

11. Obviously, if contractors had to hire exclusively Union men or at least give them first preference (since the Union was virtually all white), minority individuals seeking work or Union membership would receive little encouragement to obtain experience through employment with such contractors which would qualify them for membership.

part in his eligibility for assignment. The business agents know only a few hundred members, and usually can only rely on a limited knowledge of a man's skill. They know few minority "permit men" and generally require them to be tested, which may mean no referral. This system of giving work to Union and nonunion men on the basis of the subjective, discretionary decisions of business agents, unsupported by objective and fair tests or criteria, or even by personal observation with respect to the job skills in question, and often the result of ignorance or personal preference, operates to the disadvantage of minorities.

(32) All members of Local 15 have been admitted as full journeymen. Local 15 has never had a formal apprentice program with a specified academic or practical training curriculum, and specified periods of on-the-job training during which an apprentice is promoted to higher skill and salary levels until he reaches journeyman's status, but has relied for its membership on applicants learning the trade on their own and informally. Local 15's school, primarily designed for minorities, is not an apprentice program. The IUOE strongly encourages its local unions to form Registered Apprentice Engineers subdivisions under Article XIV of its Constitution (PX 5D), which would be governed by IUOE's standards (Tr. 3733–34), and many locals have apprenticeship programs. Although Local 15 professes to concur with the policy of the IUOE on apprenticeship programs (Tr. 49), it has declined to establish such a program. Local 15 has also never complied with requests from the New York State Department of Labor to set up an apprentice program.

If a formal apprentice program were established, Local 15 would have to regularize the procedures and techniques for training operating engineers, and would make it more likely that minorities would receive equal training.

(33) Local 15 has no consistent and objective criteria for approving applicants for membership. Up until 1971, Local 15 had no method of testing the qualifications of new persons desiring membership, and generally assumed that an individual was fully qualified and eligible for membership if the contractor who employed him was satisfied with his work. (Tr. 78). Although all of the Local 15 collective bargaining agreements have union security clauses which require new employees to join the Union after a specified period, such clauses are not consistently enforced.

When Local 15 began its training school in 1970, it began for the first time to test for itself the qualifications of some individuals who sought Union admission and referral as *operators*, but no test is administered for surveyors, mechanics, maintenance engineers or other *non-operators*.

(34) Local 15 has in the past heavily relied upon nepotistic and word-of-mouth recruitment for obtaining applicants, i. e., the opportunity to get training and job assignments for Local 15 work has depended heavily upon whether one had friends or relatives in the Union. This is still true, even as to the minorities. The existence of such schools, established for training new persons or improving the skills of the Union's members, is not generally known outside of the Union.

(35) The requirement now imposed by Local 15 on most minorities, that operators who seek admission to the Union must pass the Union's test, and must do so on at least three pieces of machinery used at the school is new, not consistently required of all applicants, and not clearly required by economic or business necessity. Of course, the ability to operate machinery is irrelevant to the many non-operators job categories available to a Local 15 journeyman. Prior to the existence of the school the requirement was less than three pieces and it was not regularly enforced.

Many people with some type of Union affiliation have been and still are admitted to membership in Local 15 without taking any test, particularly members of Locals 15A and 15C.

The Union school only administers tests on loaders, dozers and backhoes—not on other major pieces of equipment—so that the test cannot and does not even determine

whether a man can operate three pieces of Local 15 machinery. Local 15 does not require its members to operate three pieces of equipment but permits them to specialize. (Tr. 3141). If one can run one piece of machinery and desires to be a multi-skilled operator, he can pick up the techniques of other machinery on the job. Indeed, as noted, certain machinery cannot be learned at the school and must be learned on the job. (Tr. 313, 326). It should be noted that only some of Local 15–15A members are operators—there is a substantial number of members who are maintenance engineers or welders. There is enough unskilled work available to supplement the operator skills of men when they are first admitted to the Union, if they are not skilled on more than one piece of equipment. The Union should admit all men to membership with only the quantity of skills actually needed.

(36) The practical test actually administered by Local 15 to some equipment operator applicants to measure their ability as operators is the only practical or written test Local 15 administers to applicants for admission to any branch. This test is completely subjective, has never been validated as job related, and is not required by business necessity. The test is given only to some operators and not to non-operators, such as welders, shop mechanics, surveyors and others. There are no uniform and objective criteria for proficiency or skill used to determine a passing performance, there are no written questions, there are no uniform and objective tasks which are assigned as part of the test, and no evaluation is made of an applicant's knowledge of safety or repairs. There is no evidence that Local 15 has ever validated the test as job-related or which shows it is required by business necessity.

(37) The admissions policies of Local 15 discriminate against minority persons. Before 1970, white nonunion persons could obtain membership by getting a job through the Union "hall," performing satisfactorily on one piece of machinery, and then being brought into the Union under collective bargaining agreement security clauses requiring new employees to join the Union within a specified period. Thereafter he could learn to operate other equipment on the job. Today, minorities must meet a more restrictive entrance requirement than was required of the existing heavily white membership. Many new white members bypass the testing requirements by receiving training and obtaining a job through friends or relatives in the Union, and after performing satisfactorily on the job, are admitted to the Union. There is also evidence that minority applicants who have qualified for membership are forced to wait longer than white applicants before they receive their "Union book." Local 15 has used the test, in certain instances, to disqualify or discourage qualified minority applicants who should have been admitted promptly after performing satisfactorily for an employer—e. g., operators with prior private experience outside New York City, especially in Latin America and the West Indies, or with training at the Job Corps facility sponsored by the IUOE, or with military engineering training and experience.

(38) Local 15 has jurisdiction over the hoisting machine called a cherrypicker, the operator of which must have a New York City Hoist Machine License Type C. It also has jurisdiction over welders, most of whom must have a City, State or utility company license. No other equipment operated by Local 15 requires a license and very few cherrypickers are used by that Local. Accordingly, the possession of such licenses is not a prerequisite for admission to membership, although many of its members have such licenses.

(39) There is no competent evidence that minority nonunion men have been discriminated against on a job to which they have been referred by Local 15 or by their employers. Nor have minorities been intentionally discriminated against with respect to the health and welfare benefits under the collective bargaining agreements between Locals 14 and 15 and the various contractors and contractor associations, ex-

cept insofar as delay in using a "Union book" may delay receipt of such benefits.

## Local 14

### Training for Local 14

(40) Most people learn to operate Local 14 equipment informally while they are members of Local 15, relying for their training on friends or relatives who are members of Local 14 to give instruction. Members of Local 15 and 15A work as oilers, firemen, and apprentice and maintenance engineers on the heavy construction equipment such as cranes and shovels operated by members of Local 14 and thereby obtain the basic qualifications toward becoming journeymen engineers. It is possible, of course, for a man to obtain experience in an area where a license is not required, or as the result of service with the armed forces. As has been noted, Local 14's charter does not include an apprenticeship or recruitment program. This informal method of training extends to actual preparation for the City licensing test, with individual Local 14 men conducting classes for Local 15 men. While Local 14 has established a "retraining facility" at the same location as Local 15's school, it is used primarily only for those who are members of Local 14.

(41) Local 14's training and recruitment policies, on which it relies for new members, operate to discriminate against minorities. The reliance on Local 15, with its discriminatory practices, for the pool of men who may be trained results in the effective exclusion of minorities from the only viable available training. The discriminatory effect is clear: in 1974, the New York City Department of Buildings renewed 860 type A licenses, of which only 3 belonged to minority individuals, and 161 type B licenses, of which only 1 belonged to a minority individual. (PX 91C; Tr. 1692).

(42) Local 14 requires that *all* members must have a New York City Hoist Operators License, notwithstanding that much of its equipment requires no license and that members frequently specialize in non-li-censed equipment. Local 14 requires that an applicant for Union membership hold either an A or B license and all current members have had such a license at one time. However, 456 out of 1,432 members (exclusive of 14B) failed to renew their licenses between September 1, 1973 and August 31, 1974. While some portion of those who did not hold valid hoisting machine licenses during this period represents members who have retired or who were not working during this period, it seems clear that, having acquired membership, a member does not necessarily renew his license. The practical effect of a significant amount of Local 14 equipment being unlicensed and the significant degree of specialization by Local 14 operators is to permit a substantial percentage of Local 14 members to earn their living without needing any hoist machine license. There are at present from 25 to 50 long-boom cranes in the City, and there have never been more than 100. (Tr. 397, 562, 589 and 3836).

(43) Local 14 requires that all members be able to operate several pieces of major equipment, *i. e.*, two or more of such equipment as power shovels, draglines, backhoes, clamshells, pile drivers, cranes and double drum derricks, yet most of the members specialize on one particular type of equipment.

(44) Although sometimes waived, an individual must have 200 days experience operating Local 14 equipment in order to become a member. Furthermore, a member vouching for an applicant must have been a member for at least five years, must have known the applicant for at least two years prior to his application, and must not have vouched for a candidate for the past two years. (PX 6C, at 8–10).

(45) The membership requirements of Local 14 operate to discriminate against the admission of nonwhites, and are not justified by business necessity. Local 14 has intentionally limited the size of its membership, and has on occasion refused membership to qualified minorities with licenses. The membership has remained relatively

constant over the year,[12] at approximately 1,500–1,600 members, with an actual work force of approximately 1,100. (Tr. 416).

### Local 14's Referral Practices

(46) Local 14's job referral practices operate to discriminate against nonwhites. Local 14 maintains a joint hiring or job referral "hall" with Local 15 and has historically maintained this arrangement since much of the equipment is jointly manned. There is no order in referral from the "hall" and no seniority, but specialties are honored where possible. Local 14 effectively controls work opportunities within its jurisdiction. Only if there are no men out of work will the Union permit others to work in its jurisdiction. This is true even though the "permits", when given, are usually to members of other locals and primarily are for Local 14 work on which no license is required or is not critical.

### Contract Compliance and Affirmative Action

(47) Federal and local employment opportunity compliance provisions require affirmative action and minority hiring goals on publicly financed work in the operating engineers' trade in approximate proportion to the minority population in the City of New York. These goals were imposed after a voluntary plan, known as the New York Plan, to increase minority employment proved inadequate. Specific plans for placing minorities as a part of affirmative action plans encouraged by the government originated with the Federal Model Cities Program in the late 1960s in the Bedford-Stuyvesant and Brownsville sections of Brooklyn. In 1970, this concept was extended to the entire City of New York in the form of an industry-sponsored voluntary plan known as the New York Plan which was designed to bring more minorities into the construction trades and to help satisfy contract compliance requirements.

The New York Plan initially provided for a maximum of 800 (later increased to 1,000) trainees and was offered on behalf of the New York Building Trades Council. The plan applied only to public sector work, although there was an understanding, never carried out, that it would be extended to the private sector.

The City of New York withdrew from the New York Plan in 1973 because the industry did not even meet its commitment for 800 trainees in the first year of the program. New York City issued Executive Order 71 which requires minimum ranges of minority employment, including both journeymen and trainees, on a craft-by-craft basis to reach roughly the same percentage of minorities in the particular construction craft as the percentage of minorities in the population of the City of New York. The City uses a percentage goal of 38% minority representation which each craft is expected to achieve by July 1, 1978.

The Federal Government likewise withdrew its approval of the New York Plan for contract compliance purposes under Executive Order 11246. Under the latter Order relating to equal employment provisions in construction contracts with federal funding, there is now in effect a 25% minority employment goal for operating engineers. On a particular contract in which there is joint city and federal funding, the city's goal, if higher, would apply.

(48) As a participant in the New York Plan, Local 15 has provided unstructured and inadequate job assignments and training for minorities and has inhibited contractors from complying fully with equal employment contract requirements. Although Local 15 participated in the formation of the New York Plan, operating engineer trainees under that plan have been provided on-the-job training which has been very unstructured with few operating engineer trainees getting training in handling equipment. Local 15's original minority goal was 98. As of October 1974, after three years,

12. There apparently were more minorities in Local 184, Local 14's predecessor, in 1937 than in Local 14 at present.

Local 15 had placed 170 of whom 117 were currently working without "Union book" and an additional 15 had received books. (DX H). Furthermore, the Federal Government has frequently cited contractors for under-utilization of operating engineer minority workers—the contractors reporting difficulty in getting the operating engineer unions to refer sufficient minorities for them to be in compliance.

(49) Local 15's practices regarding pay scale and Union membership under the New York Plan have also discriminated against minorities. Although an operating engineer trainee is supposed to be guaranteed a "Union book" after three years, there were only 15 who had received their "Union books" since the inception of the program in 1974. This is in contradiction to the experience of whites who frequently obtain their books after being on the job for a brief period of time.

The rate of pay for operating engineer trainees, which applies only to those minorities who are members of the New York Plan, is lower than the rate of pay to journeymen and remains at a lower level for at least the three-year period. All other men enter the Union and receive full journeyman wages, even if they are performing maintenance or helper work.

(50) Local 14, whether or not it is a signatory to the New York Plan, has failed to participate in any affirmative action programs, and has actively opposed and avoided its equal employment opportunity responsibilities. The original understanding was that both Local 14 and Local 15 would participate, but Local 14 has not allowed any New York Plan trainees on its work. The failure to place or even allow permits for trainees in Local 14 includes Local 14 work which does not require a license.

## DISCUSSION

### The Statistical Imbalance

As has been found, Locals 14 and 15 both were historically almost all white, and remain substantially white today. Thus, Local 15's membership in 1974 was only 6.5% minority (415 out of 6,362 members) approximately 30% of whom were admitted after this lawsuit was commenced. (Finding No. 18). Local 14's membership in 1974 was only 2.8% minority (44 out of 1,555 members). (Finding No. 19). The minority percentage of the New York City male labor force is 30.85% and the minority percentage of such force 16 years of age and over who have a high school education or less is 36.39%. (Findings No. 21 and No. 22).

■ This enormous disparity establishes a prima facie case of a pattern and practice of discrimination in violation of the Civil Rights Act of 1964. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971); *Chance v. Board of Examiners*, 458 F.2d 1167, 1176 (2d Cir. 1972); *Carter v. Gallagher*, 452 F.2d 315, 323 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 655 (2d Cir. 1971); *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 426 (8th Cir. 1970).

■ In this circuit, the available labor force, rather than overall population statistics, has been held to be more appropriate for determining minority employment statistics. *Rios v. Enterprise Ass'n Steamfitters Local 638*, 501 F.2d 622, 632–33 (2d Cir. 1974). In other words the Court must determine what the minority percentage is for each case on the basis of the minority percentage of the labor force within a Union's jurisdiction, and from which the industry draws employees. *Id.* at 632–33. In the instant case there is no educational requirement for Union membership, and it is reasonable to conclude that only persons with a high school education or less apply for work as operating engineers in New York City. The most relevant and clearly available minority and white pools of labor for this industry can be most closely approximated

by the census figures available showing the minority and white male civilian labor force 16 years old and over with a high school education or less in the area of the Union's jurisdiction. The geographic jurisdiction of Locals 14 and 15, except for a small part of Local 15C, is New York City. (Finding No. 4).[13] Accordingly, New York City is the proper geographic jurisdiction for calculating the relevant minority labor force percentage and there is no merit in Local 15's charge that using New York City alone "grossly overstated the percentages and the figures are therefore inaccurate and an improper basis for establishing a prima facie case of discrimination" (Local 15 Memo., at 5–6), especially since the Union has introduced no evidence on the question at all. It is sufficient to state that the material utilized and the methods employed by plaintiff have been approved by this circuit. *Patterson v. Newspaper & Mail Deliverers' Union of N. Y.*, 384 F.Supp. 585, 593 (S.D.N.Y. 1974), *aff'd*, 514 F.2d 767 (2d Cir. 1975) (U.S. appeal pending); *Rios v. Enterprise Ass'n Steamfitters Local 638, supra*, 501 F.2d 622.

■ In addition it should be noted that the minority membership percentage of the unions herein is significantly lower than the percentage of minorities in other related national sources of manpower. Thus, the percentage of operating engineers coming out of the Army who are black is about 20%, far greater than the minority percentage in these unions (Finding No. 23), and this further establishes a prima facie case. *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Comm'n*, 482 F.2d 1333, 1335–37 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Chance v. Board of Examiners, supra*, 458 F.2d at 1172–73.

13. *See* Note 5 *supra*. There is testimony that some 170–180 of the 1,471 members of 15C worked outside the City because their employers had relocated certain shops outside the City. (Tr. 374–75). Also there is testimony that an unspecified number of the 1,332 members of 15D worked outside the City. (Tr. 372–73). The most favorable result for defend-

*Engagement by Local 15 in a Pattern and Practice of Discrimination*

■ While intentional discrimination against minorities is of course violative of Title VII, it is clear that such a determination is not necessary in order to find the practices of the defendant unions unlawful.

"[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Griggs v. Duke Power Co., supra*, 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 165.

■ The touchstone for any judicial scrutiny of employment practices is the Supreme Court's mandate in *Griggs* which prohibits, unless justified, *any* "employment practice which *operates to exclude*" minorities protected by Title VII or " 'freeze' the status quo". *Id.* at 430, 431, 91 S.Ct. at 853, 854, 28 L.Ed.2d at 163, 164 (emphasis added).

■ Neutral practices which have a discriminatory effect *or* which perpetuate the effects of past discrimination are unlawful. *See, e. g., United States v. Bethlehem Steel Corp., supra*, 446 F.2d 652; *United States v. Ironworkers Local 86, supra*, 443 F.2d 554; *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 248 (10th Cir. 1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); *United States v. IBEW, Local 38*, 428 F.2d 144, 149–50 (6th Cir.), *cert. denied*, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Local 189, United Papermakers and Paperworkers v. United States*, 416 F.2d 980 (5th Cir. 1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); *United States v. Sheet Metal Workers, Local 36*, 416 F.2d 123 (8th Cir. 1969). Employment practices which are fair in form but discriminatory in operation are prohib-

ant Local 15 would be to reduce the minority percentage by approximately 1%. In the face of such an insignificant amount of employment outside of the City, the use of statistics for New York City is clearly proper. *Boston Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1020 n. 4 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

ited unless shown by defendants to be required by business necessity. *Griggs v. Duke Power Co., supra,* 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164.

Once it has been shown that a practice "operates to exclude" a protected group, the defendants have the burden of showing business necessity. The rule in this Circuit is that

"[n]ecessity connotes an irresistible demand. To be preserved . . . [a practice] must not only directly foster safety and efficiency of a plant, but also be essential to those goals." *United States v. Bethlehem Steel Corp., supra,* 446 F.2d at 662 (citation omitted).

*See Local 189, United Papermakers and Paperworkers v. United States, supra,* 416 F.2d at 989.

### (a) *Recruitment and Training Practices of Local 15*

The membership of Local 15 has historically been white, and remains substantially white at present. (Finding No. 18). Its members have learned their trade from on-the-job experience and have relied, to an appreciable extent, upon friends and relatives for their training (Finding No. 25), which training has been informal and nonstandardized. Since training is a necessary prerequisite to jobs or job referrals and therefore to admission in Local 15, any discriminatory training practices operate to deny minorities equal jobs and admission to the Union. Since the Union started with practically an all white membership, the preferential practices historically denied minorities equal training opportunities and since such practices have been continued, they continue to deny minorities equal treatment and perpetuate the effects of past discrimination.

Courts in this circuit have not hesitated to prohibit discriminatory union training programs in the construction crafts in New York City that relied upon favoritism, nepotism and word of mouth practices. *United States v. Local 638, Enterprise Ass'n Steamfitters,* 360 F.Supp. 979, 990 (S.D.N.Y. 1973), *aff'd sub nom. Rios v. Enterprise Ass'n Steamfitters Local 638, supra,* 501 F.2d 622; *United States v. Wood, Wire & Metal Lathers, Local 46,* 328 F.Supp. 429, 436 (S.D.N.Y.1971), *aff'd,* 471 F.2d 408 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973).[14]

The training facility which Local 15 established is in fact only available to a limited number of people and provides haphazard training. (See Findings No. 26 and No. 27). Minorities are now uniformly sent to the school and, if there is room in the classes, are required to attend each Saturday regardless of other work commitments, while whites still rely almost exclusively on the traditional on-the-job training. A far greater percentage of whites continue to gain their training outside the school than is true for minorities. Furthermore, Local 15 has refused to recognize or accept without further training or testing minority graduates of other training programs, such as those operated by the Job Corps or by the military services.

While Local 15 may have created and operated this school with the best of intentions and as an affirmative aid to minorities, this is irrelevant if the effect has been to restrict minority employment opportunities.

### (b) *Admission Tests*

Since the establishment of the training school, Local 15 has been directing minority applicants for Union admission and job assignments to the school in order to test their skills as operators. This "test", which requires applicants to demonstrate proficiency or productivity on at least three pieces of equipment, constitutes a significant increase in Local 15's standards for admission. Heretofore, anyone performing his work to the satisfaction of the employer was admitted to the Union, and members were admitted with proficiency on only one

---

14. Such practices have also been universally condemned in other circuits. *See, e. g., United States v. Ironworkers Local 86, supra,* 443 F.2d at 552; *United States v. Sheet Metal Workers, Local 36, supra,* 416 F.2d 137; *Local 53, Asbestos Workers v. Vogler, infra,* 407 F.2d at 1054.

machine or as non-operators performing maintenance or surveyor work. Today, minority applicants for membership, and to a far lesser degree, white applicants, are forced to take a multiskill operator's test, instead of being given the chance to demonstrate their ability to work for a contractor. The consequences of failing the test are generally to not be referred for work by the union "hall," and to spend long periods of time waiting to get into and/or graduate from the small training school. Significantly, no person who gained admission prior to the institution of the test has been required to take this test either to obtain job referrals or to retain Union membership. The raising of admission standards by a union with a history of excluding minorities violates Title VII by tending to freeze the status quo. *Griggs v. Duke Power Co., supra,* 401 U.S. at 429–30, 436, 91 S.Ct. at 852–53, 856, 28 L.Ed.2d at 163–64, 167; *United States v. Jacksonville Terminal Company,* 451 F.2d 418, 456 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). *See generally United States v. Ironworkers Local 86, supra,* 443 F.2d 544; *United States v. Sheet Metal Workers, Local 36, supra,* 416 F.2d 123; *Local 53, Asbestos Workers v. Vogler,* 407 F.2d 1047 (5th Cir. 1969).

■ Not only does the test requirement perpetuate the white Union membership which exists because of prior discrimination, but also it continues to be an active and contemporary example of unlawful adverse and disparate treatment of minorities. Almost all whites admitted to Local 15 since the school began have never taken the test, irrespective of whether they are operators. During the period from December 1970 when the school was opened until November 1, 1974, the membership of Local 15 increased by 868 of whom 693 were whites and 175 were minorities. Yet there is evidence that only 20 whites graduated from the school.

■ Furthermore, the testing procedures are unlawful for the impact on minorities caused by their vague, inconsistent, subjective, and arbitrary application and administration. A test which is required of some, not of all; which relates to only a small portion of the relevant skills despite the applicant's knowledge of many others; which has no standards for measuring success; which is given by different people applying different rules; and the passing of which does not guarantee prompt union membership, is an obstruction of equal employment opportunities without any relationship to business necessity, let alone the irresistible demand required by *United States v. Bethlehem Steel Corp., supra,* 446 F.2d at 662. The requirement of proficiency with a number of types of equipment has nothing to do with safety or efficiency, and Local 15 does not argue to the contrary. It argues only that the men will be "equipped to earn a living in that industry to provide for themselves and their families." (Local 15 Memo., at 51). Finally, even were there an irresistible demand for such testing of operators, this would not in any way justify the low percentage of minorities among the many Local 15 members doing maintenance work who do not operate equipment.

■ Finally, Local 15 has violated EEOC Guidelines, 29 C.F.R. § 1607.3–.8 (1974), and therefore Title VII by using a test which adversely affects the hiring and membership of minorities without validating the test by methods prescribed by the guidelines as evidencing a high degree of utility for job performance and showing an alternative is not available. 29 C.F.R. § 1607.3. The absence of *any* validation effort simply confirms the conclusion that this test procedure has no business necessity.

(c) *Referral Practices of Local 15*

■ Local 15's job referral practices and the operation of its hiring "hall" or "day room" are informal and unstructured. There is no logical order of referral of workers, and no objective criteria for referral. (Finding No. 31). It appears that minorities are referred less frequently and wait far longer for job referrals no matter what the employment conditions are, and that Union officials tend first to refer peo-

**1174**

ple known to them who usually are Union men and therefore predominantly white. As already noted, prior to 1948 the collective bargaining agreements required employers to give hiring priority to Union members, almost all of whom were white, thereby excluding minorities. Since Local 15 is still heavily white, its referral practices are illegal because they tend to discriminate against minorities and perpetuate the effects of past discrimination. *Franks v. Bowman Transportation Co.*, 495 F.2d 398, 419 (5th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974); *United States v. Carpenters & Joiners Local 169*, 457 F.2d 210, 217 (7th Cir.), *cert. denied*, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *United States v. Bethlehem Steel Corp., supra*, 446 F.2d 652; *United States v. Ironworkers Local 86, supra*, 443 F.2d 544; *Parham v. Southwestern Bell Telephone Co., supra*, 433 F.2d 421; *Jones v. Lee Way Motor Freight, Inc., supra*, 431 F.2d 245; *United States v. IBEW, Local 38, supra*, 428 F.2d 144; *United States v. Sheet Metal Workers Local 36, supra*, 416 F.2d 123; *Local 189, United Papermakers and Paperworkers v. United States, supra*, 416 F.2d 980; *United States v. Local 638, Enterprise Ass'n Steamfitters, supra*, 360 F.Supp. 979.

*Engagement by Local 14 in a Pattern and Practice of Discrimination*

The implication that *intentional* discrimination in the membership requirements and the employment practices of Local 14 must be established is, of course, not correct. The legal standard to be applied under Title VII is the discriminatory *effect* of the Union's practices. The issue is not whether there is any reasonable justification for standards or practices once a racially disproportionate effect is shown. Rather the Union assumes a heavy burden of proving that the standards or practices which have such effect are required by business necessity. Indeed, in this circuit, the Union must show "irresistible demand". *United States v. Bethlehem Steel Corp., supra*, 446 F.2d at 662. The prima facie case of discrimination against Local 14—*i. e.*, the disparity between its membership statistics and the percentage of minorities in the available labor force—is greater than that against Local 15, so that Local 14 has a heavy burden of showing that the policies and practices which have maintained such a low minority percentage are justified. The Court must look not only to Local 14's membership requirements, but also to its sources and methods of obtaining new members, its role in the industry, and its racial composition.

It seems clear that Local 14's reliance on the predominantly white labor pool of Local 15 for recruitment and training results in the perpetuation of the white membership of Local 14, and therefore, in freezing the status quo. It operates in a discriminatory and illegal manner.

Local 14 claims to have no training program at all, but only a "retraining program" for people who are already members. While there is evidence that non-members of Local 14 have utilized the program, it seems clear that Local 14 has relied predominantly on informal on-the-job training and experience in Local 15 to enable an individual to seek entrance into Local 14. Furthermore, the informal training on Local 14 equipment which Local 15 men and some permit men receive is in fact given by members of Local 14, usually friends or relatives of the trainees.

The separate charters of Locals 14 and 15 involve no actual prohibition against training, nor is there evidence that a journeyman union is barred from offering training. In fact, the International Constitution permits and encourages such training; and a formal sub-charter for which a local may freely apply relates only to registered apprentices (PX 5D, at 40) which neither Locals possess. Where there is no formal apprenticeship program and the sole opportunity for learning the trade is on-the-job training available only to helpers working under the Local's auspices, the likelihood of discrimination is very great.

City licensing requirements have absolutely nothing to do with Local 14's self-imposed barriers to training minorities. The City does not require that those few who

receive informal on-the-job training on Local 14 equipment (whether through Local 15 or otherwise) have a license prior to their training and experience on Local 14 equipment.

█ Finally, the control which Local 14 has on the available work results in the control of others' ability to get training, resulting in the illegal exclusion of minorities. (Findings No. 14 and No. 41).

*Local 14's Membership Requirements*

█ 1) *The License Requirement.* Local 14 requires that *all* members must have a New York City Hoist Operators License, notwithstanding that much of its equipment requires no license (Finding No. 10), that members frequently specialize in non-licensed equipment, and that a substantial number of members earn their living in such non-licensed work (Findings No 42 and No. 43). The fact that Local 14 imposes a license requirement on its membership— rather than merely requiring, as does Local 15, that members who work on licensed equipment be licensed—results in the exclusion of qualified minorities from Local 14 and is unjustified by business necessity and such requirement is invalid. Not only do most members of Local 14 specialize, but it is also clear that the long-boom crane specialty involves few people; the heavy construction, road, tunnel and sewer work which utilize much non-licensed Local 14 equipment—*e. g.*, graders, rollers, shovels, locomotives, tunnel mucking machines, compressors, and welding machines—form a substantial part of the work in which the members specialize, especially in times when building work is slow. The license requirement does not measure skills for non-licensed work, nor is it a prerequisite to much of the work in Local 14's jurisdiction, except as artificially imposed by the Union on all of the potential applicants for membership in Local 14. It is significant that there are almost no minorities who actually possess a license. (Finding No. 41). This very condition is a direct result of Local 14's discriminatory training policy, relying on the predominantly white pool of Local 15

members to be trained for their licenses by Local 14 members on an informal, unstructured basis. Since the use of the license requirement for *all* Local 14 applicants excludes almost *all* minority operating engineers from membership while not excluding almost all whites, the requisite racial impact of the requirement has been shown and shifts the burden to Local 14 to show by "irresistible demand" that there is a fit between the license requirement and all Local 14 jobs. Local 14's reliance on, if not active use of, the discriminatory practices of Local 15 for training and experience for the license and membership, only accentuates the illegality of the requirement.

In the past, citizenship and language requirements imposed by the City kept blacks and Spanish-speaking persons from the Caribbean and South America from obtaining licenses, and they thereby were prevented from joining Local 14 whether they were qualified to operate licensed or non-licensed equipment. Local 14's present policies illegally perpetuate the effects of this past discrimination.

█ 2) *Ability to operate more than one piece of equipment.* Local 14 asserts that "[t]his requirement is designed to assure an applicant that he will be able to earn a living at his trade, after he has been admitted to full union membership." (Local 14 Memo., at 13–14). However, non-members are not exposed to the same experience, or allowed to attend the Local 14 retraining facility to obtain additional skills. Moreover, most members of Local 14 specialize on one piece of equipment. If a potential member has not had experience on sufficient pieces of equipment, he may be given a permit to broaden his skills, but only if he already has a license. (Local 14 Memo., at 15). There is no business necessity for excluding from membership those who are qualified on even one piece of Local 14 equipment. Nor is there any business necessity for excluding those qualified on any piece of Local 14 equipment from an equal chance at employment on the equipment on which they are qualified.

■ 3) *The 200 day experience requirement.* Local 14's requirement of 200 days experience in addition to having a license, when viewed against the background of Local 14's discriminatory training policies hereinbefore discussed, is also discriminatory. Some persons have been able to get additional experience by obtaining a "permit" from Local 14, but this "permit" is limited and not given out on a systematic basis. It is admitted that the requirement is "flexible". (Local 14, Memo., at 12). Since there are no objective criteria for applying this requirement, it cannot be sustained in its present form.

### Local 14's Job Referral Practices

■ Local 14 admittedly gives preference in job referrals to Union members, thereby effectively shutting nonunion minorities out of work within its jurisdiction and precluding them from obtaining training and experience to get a city license. The job referral system itself is informal and unstructured, with minorities who are not Union members getting jobs only when there is a shortage of available Union men. Local 14 concedes that its "day room" is only available to assist members and licensed non-members. (Local 14 Memo., at 18). The non-licensed minorities who have been excluded from membership are usually not even allowed to use the Local 14 referral facilities for access to the non-licensed work in Local 14's jurisdiction. "Permits" are issued on occasion for non-licensed work, but "permit men" do not get equally good experience as members, and may not use the Union's "retraining" facility. These practices are illegal.

It should be further noted that insofar as Locals 14 and 15 use their separate charters to prohibit a man from regularly working on *both* Local 14 and Local 15 work—whether as a member or on "permit"—if the man is capable of doing work in the jurisdiction of both Locals when job conditions permit, this use of the separate charters limits the ability of Local 15 minorities to make an adequate living.

### Lack of Affirmative Action by Locals 14 and 15 to Correct Discriminatory Practices

#### Local 15

Local 15 claims credit for its role in establishing and cooperating with the New York Plan. (Finding No. 48). However, Local 15 fails to accept, as it should, the blame for the New York Plan's limitations or discriminatory treatment by Local 15 of minorities who were supposed to be aided or for its almost total reliance on this inadequate, discriminatory plan for the training of minorities. (Findings No. 48 and No. 49). Local 15 was indirectly responsible for the failure of any extension of the New York Plan to the private sector. Local 15 could easily have placed minorities on private construction sites as well as on the public construction jobs to which the New York Plan applied. The Union would place on the City of New York the responsibility for the New York Plan's inadequacies in recruitment by claiming that it was the City which had recruited for the New York Plan. This is rebutted by Local 15's own attempt to show affirmative action by stating that it *accepted* more trainees than the sub-goal which was set for it. (Local 15 Memo., at 45–46). The City was hardly responsible for the extent of the Union's acceptance of trainees, except insofar as the City attempted to force more minorities to be hired through contract compliance efforts. Local 15 did not in fact even reach its limited "goal" under the New York Plan since the goal was supposed to be based on the number of minorities *employed* continuously during a given year, and not on the number of minorities *accepted.* (Tr. 3780–83, 3793–95).

Local 15 also cites as an example of affirmative action to place qualified minorities what it terms a "unique" agreement with the Recruitment and Training Program (hereinafter "RTP"), a program funded under a grant from the U. S. Department of Labor to facilitate the entry of minority workers into the construction industry. (Tr. 3688–89). The number of minorities referred by RTP to Local 15 were

insignificant (15 to 20 per year) and the agreement with RTP required RTP either to find the jobs itself or to locate them through the office of Federal Contract Compliance when a contractor was out of compliance, and to clear the job with Local 15 (Tr. 3697–98) rather than use the Local 15 referral "hall" or "day room" as was the practice with whites. Furthermore, not all who were referred were accepted. From 1967–1969, RTP placed 12 to 15 a year— more particularly 9 men in 1968 and 12 in 1969. Also, the agreement provided that minorities so cleared would only get their Union "books" after seven weeks on the job. When Local 15's training school was established, a new agreement was reached by Local 15 with RTP which required that minorities referred by RTP had to take an examination and demonstrate proficiency on *five pieces* of equipment and could only be referred out after they had passed all tests. It was further provided that the minorities would only receive their "Union books" after an unspecified period of time. If one did not know all of the pieces of equipment, then he was relegated to the training school until he passed on all five pieces. It therefore appears that whatever affirmative action Local 15 claims to have taken to counteract discriminatory practices was in itself discriminatory.

### Local 14

Local 14 has failed to participate in any affirmative action programs. Although it is not clear whether Local 14 was a signatory to the New York Plan, it failed to place any trainee on either licensed or non-licensed equipment. The Union continually made reference in its meetings (PX 10 and 10A) to government efforts and requirements to train and place minorities on publicly financed work and described these efforts as a "hazard" to the trade which might compel the Union to review minority labor for prospective membership.

The only actions which it attempts to characterize as affirmative action programs are two amendments to its By-laws "(1) in 1964 requiring that a member in good standing for five years could only sponsor one candidate [for membership] every two years—thus reducing the possibility of nepotism or political interference with the admission of minorities; and (2) eliminating, in 1966, the requirement that the union membership vote upon candidates for admission." (Local 14 Memo., at 7). The elimination of the requirement of a membership vote on new candidates was in fact forced on Local 14 by an amendment to the International Constitution, and the Local sought to avoid its effect by requiring applicants to "present themselves" at a regular meeting before giving a member "permission" to sponsor an applicant. (PX 10, minutes of 6/14/68, at 3). Indeed, the limitations on frequency of sponsorship and "permission" to sponsor new members only served to preserve the status quo and the racial makeup of the Union.

### CONCLUSION

For the foregoing reasons, the Court finds that Locals 14 and 15 of the International Union of Operating Engineers have engaged and are engaging in a pattern and practice of discrimination and of resistance to full enjoyment by nonwhite and Spanish surnamed workers of rights secured to them by the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(c) and § 2000e–2(d).

The parties are directed within 30 days hereof to submit proposed orders embodying injunctive and affirmative provisions to correct the abuses found to exist herein, and for such other relief as may be deemed appropriate.